UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ALLIED PORTABLES, LLC, a Florida
limited liability company;
CONNIE ADAMSON, an individual;

      Plaintiffs,

vs.                CASE NO. 2:15-CV-294-FtM-38CM

ROBIN YOUMANS, an individual;
GARDEN ST. PORTABLES, LLC, a
Florida limited liability
company, WILLIAM "BILL" OSWALD,
JR., an individual; BILLOPRO, LLC,
a Florida limited liability
company; LORI LANGLOIS, an individual;
DEBRA PALMER, an individual; and
PALMER ACCOUNTING & BOOKKEEPING
SERVICE, INC., a Florida corporation;

      Defendants.
_____/


DEPOSITION OF:      JEFFREY M. BIRNBACH

DATE TAKEN:        November 1, 2016

TIME:             1:30 P.M. until 5:04 P.M.

PLACE TAKEN:       Von Ahn Associates, Inc.
                    2271 McGregor Boulevard
                    Fort Myers, Florida

BEHALF OF:        The Defendants

REPORTER:         Karen K. Crawford, CSR, RPR
                    Notary Public
                    State of Florida at Large

---

**VON AHN ASSOCIATES, INC.**
**2271 McGregor Boulevard, Second Floor**
**Fort Myers, Florida 33901**
**Phone: (239) 332-7443 FAX: (239) 332-4066**
**Naples   South Fort Myers   Punta Gorda**

APPEARANCES:

For the Plaintiffs:

        BUCHANAN, INGERSOLL & ROONEY, PC
        2235 First Street
        Fort Myers, Florida 33901

        By:  Carl Joseph Coleman, Esquire

For the Defendants:

        KNOTT EBELINI HART
        1625 Hendry Street, Suite 301
        Fort Myers, Florida 33901

        By:  George Gift, III, Esquire

        GERAGHTY, DOUGHERTY & EDWARDS, P.A.
        Post Office Box 1605
        Fort Myers, Florida 33902

        By:  C. Berk Edwards, Esquire


Also Present:  Robin Youmans


I N D E X

| ATTORNEY | DIRECT | CROSS | REDIRECT | RECROSS |
|----------|--------|-------|----------|---------|
| Mr. Gift | 3 | | | |
| Mr. Edwards | | 109 | | |

E X H I B I T S

| NUMBER | DESCRIPTION | MARKED |
|--------|-------------|--------|
| 1 | Digital Data Forensic Analysis Report | 16 |
| 2 | Supplemental Affidavit of John Noble | 52 |
| 3 | Composite Exhibit | 120 |
| 4 | Notes | 121 |

1  Whereupon,

2                    JEFFREY M. BIRNBACH

3  acknowledged having been duly sworn to tell the truth

4  and testified upon her oath as follows:

5           THE WITNESS:  I do.

6                    DIRECT EXAMINATION

7  BY MR. GIFT:

8       Q.  If you could please state your full name for

9  the record?

10      A.  It is Jeffrey M., Marlowe, Birnbach.

11      Q.  All right, Mr. Birnbach, my name is George

12  Gift.  For the purposes of this deposition I am going to

13  go through a couple of ground rules that I'm sure you

14  have heard multiple times given your experience, but if

15  you can just bear with me.  I know they are quite

16  redundant.

17           First, I need you to verbally articulate your

18  answers.  Head nods, grunts, you know, things that the

19  stenographer cannot take down are inappropriate here.  I

20  need you to answer yes or no.  If you need me to clarify

21  something, please let me know and I will attempt to do

22  that or have it read back from the record.

23           The next thing is that if you want to take a

24  break at any time today, just let me know.  We can take

25  however much time you need.  The only qualification is

1    that you finish your answer, if there's a pending

2    question.

3            And lastly, let me finish my question before

4    you begin your response, and I will do the same, let you

5    finish before I go on to another question.

6            Are you okay with all of those rules?

7        A.  Yes.

8        Q.  And can you provide me with the address you

9    currently reside at?

10       A.  Residence is 2500 Colony Terrace, Sarasota,

11   Florida 34239.

12       Q.  Where is your business address?

13       A.  240 N. Washington Boulevard, 6th Floor,

14   Sarasota, Florida 34326.

15       Q.  And are you currently employed Mr. Birnbach?

16       A.  I am.

17       Q.  And where are you currently employed at?

18       A.  Sylint Group, Inc.

19       Q.  How long have you been with Sylint Group, Inc.?

20       A.  Two and a half years.  I had been with them

21   once, left and came back.

22       Q.  What was that time period that you were with

23   them previously and then came back?

24       A.  About two, two and a half years prior to that.

25   I was one of the original founding partners.

1      Q.  And at your previous employment with them, with

2  Sylint Group, what were your responsibilities at that

3  time?

4      A.  Project management, investigation, analysis,

5  fairly general.

6      Q.  And now?

7      A.  Very similar.  However, I am also now managing

8  director, so I actually run the business, in addition to

9  doing case work.

10      Q.  And prior to these two stints -- when was the

11  last time period that you were there with Sylint Group?

12      A.  2000 to 2002, and then I was there again in

13  2010 for some projects, and came back full time in 2014.

14      Q.  From 2002 to 2010 where were you employed at?

15      A.  Did some various consulting projects.  Took

16  some time off.  Was commodore of a yacht club.  My wife

17  gave me a daughter, spent a bunch of time at home.

18      Q.  Very nice.  What type of business is Sylint

19  Group engaged in?

20      A.  We are in cyber security, digital data

21  forensics and investigations.

22      Q.  And you're currently a private investigator; is

23  that correct?

24      A.  That's correct.

25      Q.  And you currently maintain an investigative

1    license?

2         A.   That's correct.

3         Q.   And how long have you held that license?

4         A.   A little over two years.

5         Q.   What are the requirements to maintain an active

6    private investigative license in Florida?

7         A.   You have to be able to qualify with either

8    education or experience.  And once you have that

9    license, you just have to renew it on, I guess, a

10   biannual basis.

11        Q.   And do you maintain a similar license in other

12   states or just in Florida?

13        A.   Just in Florida.

14        Q.   Did you perform any investigative work in this

15   case?

16        A.   Yes.

17        Q.   What was the investigative work that you

18   performed?

19        A.   The balance of my report.

20        Q.   Anything further than what's contained in your

21   report?

22        A.   We looked at various things on behalf of legal

23   counsel.  This was the summation of what we felt was

24   relevant.

25        Q.   Okay.  And currently while with Sylint Group do

1    you perform cyber security investigations or other work?

2        A.  We do.

3        Q.  Okay.  And also security forensics?  Security

4    forensics?

5        A.  Yes.

6        Q.  And you reference we; is there other partners

7    or managers or employees at Sylint Group?

8        A.  Total of about 20 people in the firm.

9        Q.  And did you do any investigative work on Robin

10   Youmans in this case?

11       A.  Investigation, again what's contained in the

12   report.

13       Q.  Limited to what's contained in there?

14       A.  The data we looked at is referenced in the

15   report, correct.

16       Q.  How about Garden Street Portables did you do

17   any investigative work on them?

18       A.  Other than what's contained in here, no.

19       Q.  And did you do any investigative work on the

20   plaintiffs in this case, Allied Portables?

21       A.  No.  Again, whatever we did was referenced in

22   this report.

23       Q.  No Google searches or anything like that;

24   correct?

25       A.  That would be within the scope of this type of

1    report.

2         Q.  And can you explain for me as a layman what

3    exactly digital data forensic analysis is?

4         A.  It is -- how best to describe that?  It is

5    looking at artifacts that are created by computers and

6    people's interaction with computers to determine what

7    had occurred.

8         Q.  How do you look at the artifacts that are on

9    these devices?

10        A.  Different artifacts use different tools, and we

11   look for different types of things.

12        Q.  In this instance, in this case?

13        A.  In this instance we looked at mail.  We looked

14   at mobile devices.  We looked at deleted files.  We

15   looked at a number of different elements of what was on

16   the evidence we were provided to identify again the

17   material contained in the report.

18        Q.  What practical experience do you possess in

19   digital data forensic analysis?

20        A.  Well, I have been in software and software

21   development and analysis starting with the firm in 2000.

22   I have worked on conservatively well over 75 cases in

23   the last two and a half years.

24        Q.  Have you ever been qualified as an expert in

25   any of those 75 cases?

1        A.   I have never had to have been, no.

2        Q.   So in any courts, civil, criminal, federal, you

3    have never been qualified as an expert?

4        A.   That's correct.

5        Q.   And how long have you been conducting digital

6    data forensic analysis?

7        A.   Well, intermittently since 2000.

8        Q.   Do you have any sort of special training

9    associated with forensic or digital data forensic

10   analysis?

11       A.   No.

12       Q.   And approximately how many times have you run

13   forensic data analysis like you did in this case?

14       A.   Well, again, this is a culmination of a number

15   of different tools and a number of different

16   investigative techniques.  It is not just digital data

17   forensic analysis, to be clear.

18       Q.   What other techniques are involved in your

19   preparation of this report?

20       A.   Reviewing emails, reviewing material that was

21   found on mobile devices, reviewing data that was on hard

22   drives, reviewing data that had been deleted from hard

23   drives.

24       Q.   Anything further?

25       A.   Yeah, I mean, you know, if we want to -- we

1    look at the evidence from as many different ways as

2    possible.  So that we use various tools.  Again, I have

3    identified and articulated the evidence we had in the

4    report.  I have also mentioned to you the tools we used

5    to look at this data.  And from that we are able to

6    extract certain artifacts and make certain

7    determinations on the characteristics and attributes of

8    those artifacts.

9         Q.  We will get to those in a little bit.  Just

10   doing a little bit of background here.  Approximately

11   how many data analyses have you performed since 2000?

12        A.  I have performed various elements of at least

13   75 cases.

14        Q.  Have you conducted forensic analysis of

15   Windows-based and non-Windows based computers

16   previously?

17        A.  Yes.

18        Q.  On laptops?

19        A.  Laptops, desktops, mobile devices.

20        Q.  Cell phones included?

21        A.  Yes, sir.

22        Q.  Tablets?

23        A.  Yes.

24        Q.  And IPads included in the tablets?

25        A.  Yes.

1      Q.   And do you hold any licenses in digital data

2  forensic analysis?

3      A.   No, only private investigation.

4      Q.   Do you have any other professional

5  affiliations, other than the private investigator

6  license?

7      A.   No.

8      Q.   And what percentage of your practice would you

9  estimate is devoted to performing forensic analysis like

10  you did here in this case?

11      A.   The practice of the firm or myself personally?

12      Q.   Yourself personally?

13      A.   30 percent, 40 percent.

14      Q.   And your firm?

15      A.   Probably closer to 60 percent.

16      Q.   And of that 30 percent of your work that's

17  devoted to performing forensic analysis, you have never

18  produced an expert report?

19      A.   I have.

20      Q.   And in what case did you produce an expert

21  report?

22      A.   There are several, which I believe is in my CV

23  which was attached hereto.

24      Q.   What exhibit is that?

25      A.   That was Exhibit A I believe it is.

12

1    Q.  To your expert report?

2    A.  Correct.

3    Q.  Have you ever performed a forensic analysis of

4  a company's network?

5    A.  Myself personally, no.

6    Q.  Has your company?

7    A.  Yes.

8    Q.  And do you know what the purpose of that

9  forensic analysis of the company's network was, what was

10  the purpose of that?

11    A.  Investigating breaches of the network by

12  unauthorized parties.

13    Q.  So your firm has the capability of

14  investigating breaches of companies' networks; correct?

15    A.  Uh-huh.

16    Q.  But you didn't do that analysis here in this

17  particular case; correct?

18    A.  That's correct.

19    Q.  On how many occasions have you testified as an

20  expert witness?

21    A.  I have never been asked to testify.  Usually my

22  reports cause people to settle.

23    Q.  How many depositions have you given in your

24  career?

25    A.  Oh, it has been years.  Maybe only two or

three.

Q.   In terms of this case, who else assisted at your office with the preparation of this report, review of the documents?

A.   John Jorgensen would review the documents. John is one of our senior partners.

Q.   What's his background?

A.   He spent 25 years with the NSA.

Q.   Performing digital --

A.   Analysis --

Q.   So he has experience in digital data forensic analysis?

A.   Correct.

Q.   What part of that 25 years is experience in performing digital data forensic analysis?

A.   I wouldn't know.

Q.   Do you know if he holds any licenses or certifications with respect to digital data forensic analysis?

A.   I do not know.

Q.   Was he -- John Jorgensen was the name; correct?

A.   Yes.

Q.   Was he referenced in the report?

A.   No.

Q.   Why wasn't he tasked with preparing this

1    report?

2         A.  Just as a standard matter of practice we do a

3    peer review before anything goes out.

4         Q.  Can you explain that?

5         A.  Yeah, we have one of the other partners look

6    over the work before it leaves.

7         Q.  And so John reviewed your work before it left;

8    correct?

9         A.  Correct.

10        Q.  And in this case have you been designated as an

11   expert by the plaintiffs, Allied Portables and Connie

12   Adamson?

13        A.  I believe so, yes.

14        Q.  And have you been retained by plaintiffs,

15   Allied Portables and Connie Adamson?

16        A.  By plaintiffs.  I don't recall if it's

17   specifically by Connie Adamson.  I was retained by the

18   law firm representing them.

19        Q.  Buchanan Ingersoll is the one that retained

20   you; correct?

21        A.  Yes.

22        Q.  Do you have an engagement letter with Buchanan

23   Ingersoll?

24        A.  We do.

25        Q.  Have you attached that to your report?

1        A.   I have not.

2        Q.   Is it referenced in your report who you are

3   engaged by?

4        A.   Yes, second page, Sylint was engaged by

5   Buchanan Ingersoll & Rooney.

6        Q.   Approximately when were you engaged by Buchanan

7   Ingersoll?

8        A.   I don't recall.

9        Q.   The summer?

10        A.   Yeah, July, maybe August.

11        Q.   And what was the scope of your engagement in

12   this case?

13        A.   We were asked to review digital data

14   repositories that had been collected from various

15   sources and provide our findings.

16        Q.   In an expert report; correct?

17        A.   Correct.

18        Q.   Are you being compensated for your services as

19   an expert witness in this case?

20        A.   Yes.

21        Q.   How much have you been compensated to date?

22        A.   I don't know the exact figure.  Offhand I would

23   say somewhere in the area of $7,000.

24        Q.   That is seven zero zero zero?

25        A.   Correct.

1    Q.   Do you know who has paid you for the

2  approximately $7,000 worth of services performed in this

3  case?

4    A.   I do not.

5    Q.   I would like to show you what we'll mark as

6  Exhibit 1 and ask to you identify this document, please.

7         (Exhibit 1 marked for identification.)

8         Can you identify that document for me,

9  Mr. Birnbach?

10   A.   Yes, that's the report and the exhibits we

11  produced to counsel.

12   Q.   If you can flip to Exhibit B for your report.

13  For purposes of this deposition I will call this report

14  or expert report.  You are on Exhibit B; correct?

15   A.   I am.

16   Q.   Starting with the first page after Exhibit B

17  can you identify who is listed as providing this device

18  to you?

19   A.   It is a Rhonda Reid.

20   Q.   And do you know where Rhonda Reid is employed

21  at?

22   A.   I believe she is with Buchanan Ingersoll.

23   Q.   What does Client POC indicate at the top right

24  hand?

25   A.   That would be the point of contact.

1    Q.   And what's the date of intake on this first

2    evidence log of Exhibit B?

3    A.   8-15.

4    Q.   And what's the description of the devices that

5    were evidently provided to you?

6    A.   It's a DVD 4.7 GB Labeled coming from Robin

7    plus Bill Data Extraction.

8    Q.   Turning to the second page of Exhibit B who's

9    the point of contact listed in this evidence log?

10   A.   Mr. Coleman.

11   Q.   And who provided this to you?

12   A.   Again Rhonda Reid.

13   Q.   And the date of intake?

14   A.   8-15.

15   Q.   Of 2016?

16   A.   2016, yes.

17   Q.   And what's the description of the evidence that

18   is included

19   A.   Also a DVD 4.7 GB Labeled Allied Portables,

20   John Noble, Robin's iPad Extraction.

21   Q.   And turning to Page 3 of Exhibit B who provided

22   this document to you?

23   A.   The document or the article?

24   Q.   The article contained and referenced in the

25   evidence log.

1      A.   Rhonda Reid.

2      Q.   And the point of contact is?

3      A.   Mr. Coleman.

4      Q.   And the date of intake?

5      A.   8-15.

6      Q.   And what's the description of the evidence that

7   was provided to you on 8-15 of 2016?

8      A.   DVD 4.7 GB Labeled Allied Meeting.

9      Q.   And do you know what that document was

10  comprised of?

11     A.   The document or the item?

12     Q.   The document or item that is described in

13  evidence description DVD 4.7 GB, Labeled Allied Meeting?

14     A.   It was material provided purportedly by John

15  Noble, who was another investigator, and I don't recall

16  exactly what was on that disk.

17     Q.   Turning to the next page who is the point of

18  contact that's indicated on this evidence log?

19     A.   Mr. Coleman.

20     Q.   And who provided this laptop to you?

21     A.   John Noble.

22     Q.   And what date was that -- was the date of

23  intake that's listed on the evidence log?

24     A.   8-22.

25     Q.   What's a description of the evidence that was

1    provided to you on 8-22-2014?

2        A.  Dell Latitude E6400, Laptop, Black.

3        Q.  Did you perform a forensic digital data

4    forensic analysis on the Dell Latitude E6400 Laptop?

5        A.  Yes.

6        Q.  As part of this report; correct?

7        A.  Correct.

8        Q.  Turning to the next evidence log who is the

9    point of contact that's listed?

10       A.  It's Carl Coleman.

11       Q.  And does this document show who sent you the

12   Hitachi 160 GB piece of evidence?

13       A.  It would have been contained in the parent

14   document.  If you notice it's referenced 5.1, which

15   means it's a subset of -5, which came in the previous

16   page.

17       Q.  And what is the date of intake on this evidence

18   log?

19       A.  8-22.

20       Q.  And what's the description of the device that

21   was provided with respect to this evidence log?

22       A.  Hitachi 160 GB, 2.5" Hard Drive, from Item 5.

23       Q.  And did you perform a forensic analysis of the

24   Hitachi 160 GB 2.5" HDD?

25       A.  Yes.

1    Q.  As part of this --

2    A.  As part of Number 5, Article 5.

3    Q.  And as part of this expert report; correct?

4    A.  Yes.

5    Q.  Turning to the next evidence log who is the

6    point of contact listed?

7    A.  Mr. Coleman.

8    Q.  And who provided the device that's indicated in

9    this evidence log to you?

10   A.  John Noble.

11   Q.  What is the description of the device

12   A.  Dell, Lenovo, ThinkPad W540.

13   Q.  Is that an iPad or a tablet or --

14   A.  It's a Dell laptop.

15   Q.  And what's the date of intake on this evidence

16   log?

17   A.  8-22-2016.

18   Q.  Did you perform a digital data forensic

19   analysis of this laptop?

20   A.  We did together with the hard drive on the

21   following page.

22   Q.  Turning to the next evidence log who is the

23   point of contact listed?

24   A.  Carl Coleman.

25   Q.  And who provided the item described in this

1  evidence log to you?

2      A.  It would have been part of parent item 6 on the

3  previous page coming from Mr. Noble.

4      Q.  And what's the date of intake?

5      A.  8-22-2016.

6      Q.  Did you perform a digital data forensic

7  analysis of the HGST, 500 GB 2.5" HDD from item 6?

8      A.  We did.

9      Q.  As part of your analysis in this expert report?

10     A.  Correct.

11     Q.  Turning to the next evidence log who is the

12  point of contact listed?

13     A.  Carl Coleman.

14     Q.  And the device that is indicated on this

15  evidence log is?

16     A.  SanDisk 4 GB USB thumb drive.

17     Q.  Do you know what is contained on this thumb

18  drive?

19     A.  I do not recall.

20     Q.  What's the date of intake on this thumb drive?

21     A.  8-22-2016.

22     Q.  Was there a forensic analysis performed with

23  respect to the thumb drive contained on this evidence

24  log?

25     A.  We ran certain tools against it, but we didn't

1    dive into it very deeply.

2         Q.  And why is that?

3         A.  We felt there was no need because we had found

4    other material in other places.

5         Q.  But sitting here today you don't know what was

6    contained on this thumb drive?

7         A.  I do not.

8         Q.  Did you at the time?

9         A.  Yes.

10        Q.  Which was approximately two months ago?

11        A.  Correct.

12        Q.  Who provided this document -- or this thumb

13   drive to you?

14        A.  John Noble.

15        Q.  As part of -- do you know if this thumb drive

16   was a part of his previous analysis in this case?

17        A.  I do not know that.

18        Q.  Turning to the next evidence log can you tell

19   me who would the point of contact is?

20        A.  It's Carl Coleman.

21        Q.  What's the date of intake?

22        A.  8-22.

23        Q.  And the device that's described in this

24   evidence log?

25        A.  It is a Seagate, 160 GB 3.5" HDD.

1    Q.  And that is --

2         MR. COLEMAN:  Counsel, I think you may have

3    skipped a page.

4  BY MR. GIFT:

5    Q.  That's what I was asking.  Is that the ninth

6  page of Exhibit B?  I think I may have skipped a page.

7         MR. COLEMAN:  There were two thumb drives.

8         MR. GIFT:  Correct.

9    A.  5, 5.1, 6, 6.1, 7 -- I apologize, yes.  Page 8

10  would have been the PNY 16 GB USB thumb drive.

11   Q.  The point of contact is Carl Coleman; correct?

12   A.  Yes.

13   Q.  What's the date of intake?

14   A.  8-22-2016.

15   Q.  Do you know what was contained on this thumb

16  drive?

17   A.  I do not.  I do not recall.

18   Q.  Do you know who provided you with this thumb

19  drive?

20   A.  Mr. Noble.

21   Q.  And was that thumb drive analyzed in his

22  analysis that was performed earlier in this case?

23   A.  I don't know what Mr. Noble did.

24   Q.  You never spoke to Mr. Noble?

25   A.  No, I did not.

1      Q.   No emails?

2      A.   We may have had emails from the firm asking for

3    information, but I never spoke with him about the case.

4      Q.   Did anyone that assisted you with the

5    preparation of this report speak to Mr. Noble?

6      A.   Yes.

7      Q.   And who was that?

8      A.   It would have been Matt Baptiste.

9      Q.   And Matt Baptiste is indicated on this evidence

10   log in the chain of custody; correct?

11     A.   Yes.

12     Q.   Turning to the next evidence log who is the

13   point of contact identified?

14     A.   Carl Coleman.

15     Q.   And the date of intake?

16     A.   8-22.

17     Q.   And the description of the device?

18     A.   Seagate 160 GB 3.5" HDD, Labeled Robin.

19     Q.   Is that a hard drive or a thumb drive?

20     A.   It's a hard drive.

21     Q.   Do you know what was contained on that hard

22   drive?

23     A.   Yes.

24     Q.   What was contained on that hard drive?

25     A.   There were -- operating system, there were

1  files, there were emails, a number of different things

2  one would expect to find on a desktop computer running

3  Windows.

4       Q.  Allied's server wasn't contained on this hard

5  drive; correct?

6       A.  That is correct.

7       Q.  And who is listed in the chain of custody on

8  this evidence log?

9       A.  John Noble -- I'm sorry, Mathew Baptiste

10  received it.  John Noble provided it.

11       Q.  And the next evidence log in Exhibit B who is

12  identified as the point of contact?

13       A.  It would be Carl Coleman.

14       Q.  And what is the date of contact?

15       A.  8-22-2016.

16       Q.  What's the device described in this evidence

17  log?

18       A.  HGST, 500 GB 3.5" Hard Drive, Labeled Bill.

19       Q.  So that's a hard drive as well; correct?  And

20  who is listed in the chain of custody on this evidence

21  log?

22       A.  It's blank.

23       Q.  Why is that?

24       A.  It would have been an oversight by

25  Mr. Baptiste.

1    Q.  An oversight in terms of filling this out?

2    A.  Yeah.  He filled it out.  He just failed to

3  sign it.

4    Q.  Is that a regular practice at the Sylint Group?

5    A.  It is not.

6    Q.  And turning to the next evidence log in Exhibit

7  B who is the point of contact listed?

8    A.  Carl Coleman.

9    Q.  And the date of intake?

10    A.  8-22-2016.

11    Q.  And what's the description of the device that's

12  contained in this evidence log?

13    A.  WD, 500 GB, 3.5", Blue.

14    Q.  What is that type of device?

15    A.  That would have been -- it would have been the

16  drive from Lori's computer.

17    Q.  Lori Langlois?

18    A.  Correct.

19    Q.  Who provided Sylint Group with this device?

20    A.  Mr. Noble.

21    Q.  And that one is signed by Mr. Baptiste of the

22  Sylint Group; correct?

23    A.  Yes.

24    Q.  Turning to the next evidence log what's the

25  description of the device contained in here?

1        A.   It's Western Digital 2 TB 3.5" hard drive,

2   Green.

3        Q.   Do you know what was contained on this device?

4        A.   Yes.   This was a laptop purportedly used by

5   Robin at Green Street -- I'm sorry, at Garden State

6   Portables.

7        Q.   Garden Street?

8        A.   I'm sorry, Garden Street.

9        Q.   You said purportedly used by Robin Youmans;

10  correct?

11       A.   That's correct.

12       Q.   And who advised you that it was purportedly

13  used by Robin Youmans at Garden Street?

14       A.   That would have come from John Noble.

15       Q.   Who is -- who provided you with this device;

16  correct?

17       A.   Yes, that's correct.

18       Q.   Did you run any forensic data analysis in this

19  case on this device?

20       A.   We did.

21       Q.   Who is the -- on the following page in the

22  evidence log who's the point of contact?

23       A.   Carl Coleman.

24       Q.   What's the device description contained in this

25  evidence log?

1        A.   WD, 1 TB 3.5" hard drive, Green, Labeled

2    Lori's.

3        Q.   Lori Langlois?

4        A.   I am reading to you what it says Lori's;

5    correct, Lori Langlois.

6        Q.   What is the date of intake on this device?

7        A.   8-22-2016.

8        Q.   And who provided this device to you?

9        A.   John Noble.

10        Q.   And who received this device at Sylint Group?

11        A.   Matt Baptiste.

12        Q.   This evidence log is executed; correct?

13        A.   Correct.

14        Q.   The next evidence log who is the point of

15    contact?

16        A.   Carl Coleman.

17        Q.   What's the date of intake?

18        A.   8-22-2016.

19        Q.   And a description of the device contained in

20    this evidence log?

21        A.   Apple, iPhone 4, model number A1349.

22        Q.   Do you know whose Apple iPhone 4 this was?

23        A.   Yes.

24        Q.   And whose was it?

25        A.   This was attributed to Robin Youmans.

1   Q. Do you know when she possessed this phone?

2   A. We do not.

3   Q. And who was this phone received from?

4   A. It was received from John Noble.

5   Q. Do you know when he received this phone?

6   A. I do not.

7   Q. So the chain of custody that's listed in the

8 evidence log here is from 8-22-16 through present day;

9 correct?

10   A. Correct.

11   Q. Does Sylint Group still possess all of the

12 devices that are contained in these evidence logs?

13   A. I believe we do, yes.

14   Q. Turning to the next evidence log who is the

15 point of contact that's indicated at the top right hand?

16   A. Carl Coleman.

17   Q. What's the device that's contained in this

18 evidence log?

19   A. Apple, iPhone 5S, model number A1533.

20   Q. And whose iPhone was that?

21   A. That was -- that was used by Robin Youmans.

22   Q. And how do you know that?

23   A. It's associated with two telephone numbers that

24 were used by her as noted in the report on page 2.

25   Q. And do you know when it was last possessed by

1    Robin Youmans?

2        A.   I do not.

3        Q.   Do you know when it was last used by Robin

4    Youmans?

5        A.   I do not.

6        Q.   And Sylint Group still possesses this iPhone;

7    correct?

8        A.   I believe that's correct, yes.

9        Q.   And was a forensic digital data analysis

10   performed on this iPhone?

11       A.   It was.

12       Q.   Turning to the next evidence log who is the

13   point of contact that's indicated at the top right-hand

14   corner?

15       A.   Carl Coleman.

16       Q.   What's the description of the device?

17       A.   Apple, iPad 4h Generation.

18       Q.   And what's the date of intake?

19       A.   8-22-2016.

20       Q.   Did you perform a forensic analysis of this

21   device?

22       A.   We did.

23       Q.   And does Sylint Group still possess this

24   device?

25       A.   It does.

1      Q.   Okay.  And whose Apple iPad 4th Generation is

2  this?

3      A.   This was also affiliated with Robin Youmans.

4      Q.   Do you know when she last possessed this iPad?

5      A.   We do not.

6      Q.   Do you know when she last used this iPad?

7      A.   We do not.

8      Q.   Do you know when she last accessed this iPad?

9      A.   We do not.

10      Q.   And you received this iPad from John Noble;

11  correct?

12      A.   Correct.

13      Q.   And Matt Baptiste -- Matthew Baptiste received

14  it?

15      A.   Correct.

16      Q.   Is that correct?

17      A.   Yes.

18      Q.   And the last evidence log in Exhibit B who is

19  the point of contact that's referenced?

20      A.   Carl Coleman.

21      Q.   And what's the date of intake?

22      A.   9-13-2016.

23      Q.   And what's the description of the device?

24      A.   DVD, Labeled Allied V Youmans, Additional

25  Documents Box.com.

1    Q.  Do you know what was contained on this DVD?

2    A.  Yes.

3    Q.  What was that?

4    A.  Documents that had been reportedly stored in

5    Box.com.

6    Q.  Which documents were those?

7    A.  They were business documents related to Allied

8    Portables.

9    Q.  What sort of business documents; do you know?

10   A.  I don't recall.

11   Q.  So in all of the devices that are contained in

12   the evidence logs attached as Exhibit B to your report

13   they were provided to you in August or September of

14   2016; correct?

15   A.  Yes.  And I have to tell you, if I may, I may

16   have misspoke.  When you asked me if we know when these

17   items were used last by Miss Youmans, we know when they

18   were used last.  It's our understanding that they were

19   her items.  However, I don't have any -- I don't have

20   the ability to know when she used them last.  We know

21   when they were last used.  I just want to clarify that

22   point.

23   Q.  Who last used them?

24   A.  I don't have that information offhand, but we

25   certainly have that in our data.  It wasn't part of our

33

1    report.

2         Q.   Why?

3         A.   It wasn't relevant.

4         Q.   It's not relevant for who last used the devices

5    that are contained and referenced in your expert report?

6         A.   We produced a report very specifically that

7    looked to see if Miss Youmans and the others may have

8    accessed data belonging to Allied Portables that was the

9    scope of our investigation.

10        Q.   And what was the scope of the dates of that

11   investigation, what exact dates were you looking for?

12        A.   We were looking for anything that may have

13   occurred subsequent to August 29.

14        Q.   And why that date?

15        A.   It was reported to us that that was the date of

16   termination.

17        Q.   And who reported that to you?

18        A.   Our client.

19        Q.   Buchanan Ingersoll?

20        A.   Buchanan Ingersoll.

21        Q.   Okay.  With each device that's listed in here

22   how long does that take to run a forensic -- a digital

23   data forensic analysis?

24        A.   Well, depending upon the size of the repository

25   and the tools used it requires a fair period of machine

1    processing where the application goes through and looks

2    at every sector on the hard drive.  In come cases that

3    could be a matter of hours, and in some cases it could

4    be a matter of days.

5        Q.  You had mentioned that there were documents

6    maintained on Box.com; correct?

7        A.  Correct.

8        Q.  That was in the last evidence log attached as

9    Exhibit B?

10        A.  Correct.

11        Q.  Who maintains the Box.com account?

12        A.  I do not know.

13        Q.  You don't know whether it was Allied Portables

14    or --

15        A.  I do not.

16        Q.  -- or anyone else?

17        A.  Correct.  It was reported to us there would be

18    documents coming from Allied, but not something we

19    looked into.

20        Q.  Why?

21        A.  Again, didn't feel it was within the scope of

22    what we were asked to do.

23        Q.  And what was that scope that you were asked to

24    do?  It's listed in your report; correct?

25        A.  It is, correct.

1        Q.   What is that scope?

2        A.   We were asked to determine if there was any

3    access to Allied information after August 29.

4        Q.   Via these devices?

5        A.   Correct.

6        Q.   And turning to Figure 1 on page 2 of your

7    report are all of these the listed devices that are --

8    we went through as Exhibit B in the evidence logs?

9        A.   Yes.

10       Q.   And they are all accounted for in this table;

11   correct?

12       A.   Yes, sir.

13       Q.   Is there an Allied server indicated in Figure 1

14   of your report?

15       A.   No.

16       Q.   Going back to the scope of your engagement, is

17   that indicated in your report?

18       A.   It is broadly noted.

19       Q.   Where at?

20       A.   Beginning of the second paragraph.

21       Q.   Are these devices that are listed in Figure #1

22   of your report are they a repository where everybody can

23   access them?

24       A.   No, they would have been specific to computers,

25   devices, and they would show who had logged in at the

1    time of use based on the computers.

2         Q.  So it is based on an independently operated

3    device; correct?

4         A.  Yes.

5         Q.  They are not shared devices; correct?

6         A.  We did see on certain devices that there were

7    different user accounts set up, but we were looking

8    specifically to see who the users were on these

9    accounts.

10        Q.  And do you recall which device in Figure 1 had

11   the shared or multiple log-ins by multiple people?

12        A.  I do not recall, no.

13        Q.  Is that included in your report?

14        A.  It is not.

15        Q.  Is Allied Portables' server identified in

16   Figure #1?

17        A.  It was not produced for us, no.

18        Q.  Why not?

19        A.  I don't know.

20        Q.  Do you know if they have a server?

21        A.  I don't know.

22        Q.  Do you know if they have a network?

23        A.  I know they have a network.

24        Q.  Do you know when they first obtained the

25   network?

1       A.   I do not.

2       Q.   In any of the devices that you looked at here

3  was there any indications that they were ever connected

4  to a server?

5       A.   Yes.

6       Q.   Which server?

7       A.   Well, they were connected to a mail server.

8  And it appeared that they may have had just -- a Peer to

9  Peer network where they could have gone ahead and shared

10  data with each other.

11       Q.   Between the devices themselves?

12       A.   Possibly.

13       Q.   Did that happen here?

14       A.   Again, beyond the scope of what we were looking

15  at.

16       Q.   So you don't know whether or not that happened

17  here; correct?

18       A.   Right.

19       Q.   Is that Peer to Peer networking ever referenced

20  in your report?

21       A.   It is not.  The artifacts we found spoke for

22  themselves.

23       Q.   So you didn't do any review of Allied's network

24  or their server; correct?

25       A.   Correct.

1    Q.   And were any of the devices that were listed

2    and are listed in Figure #1 of your report were those

3    connected to Allied Portables' server or network?

4    A.   Some were.

5    Q.   When you were doing your analysis?

6    A.   No.

7    Q.   Prior to?

8    A.   Prior to.  Clearly Apple iPads, if they were on

9    the network, they would only be on the wifi portion of

10   the network, if you will, being able to access to get

11   out to the internet.  They wouldn't be a network address

12   that you could address normally from another machine.

13   Q.   So when you performed your forensic analysis

14   here, they weren't connected to the Allied network?

15   A.   That's correct.

16   Q.   Or the server?

17   A.   Correct.

18   Q.   Do you know when the last time any of these

19   devices were connected to the Allied network or server?

20   A.   We would have that data.  I don't recall

21   offhand.

22   Q.   You had mentioned previously a mail server.

23   What mail server was that that you were mentioning?

24   A.   They are using an exchange, Microsoft Exchange.

25   Q.   Allied Portables is?

1      A.  Correct.

2      Q.  Do you know when they started using Microsoft

3  Exchange?

4      A.  I do not.

5      Q.  That's not part of your analysis in this

6  report; correct?

7      A.  When they started using it, no.

8      Q.  And so there were no other devices that you

9  performed a digital data forensic analysis, other than

10  that listed in Figure #1 of your report; correct?

11      A.  That is correct.

12      Q.  No network or server?

13      A.  Correct.

14      Q.  At the bottom of Page 2 of your report it

15  identifies an email account of ryoumans@3458gmail.com?

16      A.  Correct.

17      Q.  Is that an actual email that you analyzed in

18  this report?

19      A.  It's a typo.  It should be

20  ryoumans3458@gmail.com.

21      Q.  So now with respect to these devices, if you

22  don't look at Allied's network, then how do you know

23  that they were ever connected to that network?

24      A.  We were asked to see if there was any

25  unauthorized access after 8-29.  We were able to

1    determine that both Miss Youmans and Mr. Oswald had
2    accessed Allied's mail server on the morning of the 30th
3    and copied off -- let me back up -- and had sent to
4    themselves copies of numerous communications.
5        Q.  And the mail server being Microsoft Exchange?
6        A.  Correct.
7        Q.  And you said unauthorized access to these
8    emails; correct?
9        A.  Correct.
10       Q.  How do you know it was unauthorized?
11       A.  It's our understanding they were not authorized
12   to have access to the Allied information after
13   termination.
14       Q.  And do you know who told Bill Oswald and Robin
15   Youmans that they were not authorized to access?
16       A.  I do not.
17       Q.  Now with respect to Robin Youmans, how many
18   emails and attachments do you allege that she sent on
19   August 30th of 2014?
20       A.  There were over 440 attached emails.  There
21   were 16 emails that had a number of emails placed into
22   them as attachments.  Many of those had further
23   attachments.
24       Q.  And they were sent from which account to which
25   account, email account to email account?

1      A.  They were sent from Robin Youmans' Allied

2  account to ryoumans3458@gmail.com.

3      Q.  What was Robin Youmans' Allied account?

4      A.  I don't know that I have that with me.  I would

5  have to go back and look.

6      Q.  Is it referenced in your report anywhere?

7      A.  It may be.  Robin@alliedportables.com is one

8  account we know she had.  Whether it was that account or

9  another I would have to verify.

10     Q.  So is there another Allied account that Robin

11 Youmans used while she was with Allied Portables?

12     A.  I don't recall.

13     Q.  So with respect to these 16 emails and over 440

14 attached emails, you don't know which Microsoft Exchange

15 account at Allied Portables it was transmitted from?

16     A.  Robin Youmans' Exchange account I do know that.

17     Q.  You just don't know the domain name; correct?

18     A.  All I would know it's Allied Portables.  I

19 wouldn't know specifically which account.  We know the

20 domain name.  I don't recall if there were multiple

21 accounts that she may have used over a period of time.

22     Q.  And how do you know this?

23     A.  How do I know what?

24     Q.  How do you know that it was sent from Robin

25 Youmans?

1        A.   We looked at the header information in the

2   emails, which gives us specifically who the sender was

3   and who the receiver was.

4        Q.   That's their domain name; correct?

5        A.   Well, the domain name would be the part that is

6   after the @ sign but, yes, Allied Portables.

7        Q.   So it would be a name @alliedportables.com?

8        A.   Correct.

9        Q.   So these names were presumably indicated Robin

10  Youmans and Bill Oswald; correct?

11       A.   Correct.

12       Q.   Are those emails attached to your report at

13  all?

14       A.   No.

15       Q.   Why not?

16       A.   We produced a list of files for counsel.

17       Q.   A list of files that were sent on August 30 of

18  2014?

19       A.   Correct.

20       Q.   But those weren't included or attached to your

21  report?

22       A.   Correct.

23       Q.   They are not even referenced with the exception

24  of 16 emails with over 440 attached emails; correct?

25       A.   That's correct.

1   Q.  With respect to the headers, does that tell you
2   which server it was sent from and received to?
3   A.  It will tell you where the mail was routed,
4   yes.
5   Q.  And did you examine that?
6   A.  We did.
7   Q.  And what did that disclose with respect to
8   these 16 emails?
9   A.  They went through the Exchange account
10  belonging to Allied Portables.
11  Q.  On August 30th of 2014?
12  A.  Yes, sir.
13  Q.  During the 18 minutes that you referenced on
14  page 3 of your report; correct?
15  A.  Yes, sir.
16  Q.  Now with respect to the attachments to the
17  emails, what was the content of those emails?
18  A.  They were a variety of email messages with
19  attachments from and/or to Robin pertaining to Allied
20  Portables.
21  Q.  You are just not sure of the email name that it
22  was sent from; correct?
23  A.  I am sure it was Robin Youmans' Exchange
24  account on alliedportables.com.
25  Q.  Do you know if Robin Youmans actually sent

1    those emails from that account?

2        A.   No.

3        Q.   Do you know if anybody at Allied Portables had

4    Robin Youmans' Allied Portables account information,

5    email account information?

6        A.   I do not know.

7        Q.   Is it possible that someone could have had

8    Robin Youmans' Allied Portables Microsoft Exchange email

9    name and password?

10       A.   Yes, it's possible.

11       Q.   And could have logged on and sent these emails

12   on August 30th of 2014; correct?

13       A.   Yes.

14       Q.   So you know for positive sitting here today

15   that Robin Youmans sent these emails; correct?

16       A.   I know that these emails came from Robin

17   Youmans' account to Robin Youmans' personal account.

18       Q.   Okay.  What device listed in Figure 1 of your

19   report were these emails sent from?

20       A.   Don't know.

21       Q.   Well --

22       A.   It may not have been any of those devices.

23       Q.   Turning to page 3 the second full paragraph you

24   state it's, "A review of a desktop computer used by

25   Robin Youmans."

1          A.   Right.

2          Q.   Then you designate that as Robin-PC; correct?

3          A.   Correct.  She didn't send them from that

4    machine, all right.  However, these accounts had

5    Microsoft ActiveSync, which allows you to use multiple

6    devices on the same email account, and each device will

7    have the updated files what was sent and received.  So

8    regardless of what platform Miss Youmans may have used

9    this particular desktop was still connected and it

10   allowed syncing to the mail server, which basically put

11   all of these sent messages into her sent message folder.

12   It doesn't matter what machine she used to send them.

13         Q.   You say it was connected, connected to what?

14         A.   Connected to the network at Allied Portables

15   office.

16         Q.   I thought you said earlier that you didn't

17   perform a forensic analysis of Allied Portables'

18   network?

19         A.   We did not.

20         Q.   So then how do you know that it was connected

21   to the Allied Portables' network?

22         A.   That was reported to us by the client.

23         Q.   But your forensic analysis of all of these

24   devices doesn't include an analysis of the network;

25   correct?

1        A.  That's correct.

2        Q.  So you don't know that for sure that this

3   desktop was connected to Allied Portables' network?

4        A.  It would have had to have been to get these

5   emails.

6        Q.  So is that desktop computer -- where was that

7   located?

8        A.  Allied Portables office.

9        Q.  It would have to be; correct?

10       A.  Correct.

11       Q.  And --

12       A.  Plugged into the internet and it would be

13   syncing on a periodic basis with the mail server.

14       Q.  So someone would have had to have been

15   physically at Allied Portables to send these emails;

16   correct?

17       A.  No, that's not correct at all.

18       Q.  And how is that?

19       A.  Miss Youmans could have logged on to her email

20   account from any device, taken these emails and

21   forwarded them to her personal account.  It just so

22   happens that a copy of that transaction would have been

23   synced out to the desktop sitting at the office.

24       Q.  You mentioned multiple devices were connected;

25   correct?

1      A.   Correct.

2      Q.   Which devices in Figure 1 were connected?

3      A.   Was connected to?

4      Q.   I don't know.  You tell me.

5      A.   Well, connected is a big word with many

6  meanings.  Be more specific for me, if you can.

7      Q.   Which of these devices were connected to the

8  Allied Portables' network?

9      A.   I don't know specifically which devices were

10  connected.

11      Q.   You don't know about any of the devices

12  contained in Figure #1 of your report whether or not

13  they were connected to Allied Portables' network?

14      A.   We know they -- these devices may have been

15  connected from time to time.  I cannot tell you

16  specifically which devices were connected at a given

17  point in time.

18      Q.   But you can tell that they were connected to

19  the Allied Portables' network on August 30th of 2014

20  from 10:31 a.m. to 10:49 a.m.?

21      A.   Because of the data that's on them; that's

22  correct.

23      Q.   And was there any more emails that were sent

24  from any of these synced devices after August 30th of

25  2014?

48

1        A.  There were a few devices, a few emails that

2    appear to have been sent, yes.

3        Q.  That were connected to Allied Portables'

4    network?

5        A.  Working under the understanding that the

6    desktop was sitting at Allied Portables' facility I

7    would say so, yes.

8        Q.  So these -- this sync engage I think is what

9    you --

10       A.  ActiveSync.

11       Q.  -- ActiveSync that syncs multiple devices;

12   correct?

13       A.  Correct.

14       Q.  And do you know which devices were synced that

15   are listed in Figure 1?

16       A.  We know that the desktop -- let's see.  We know

17   the desktop is synced.  We know that the laptop we

18   synced to Mr. Oswald's account.  We know that Mr. Oswald

19   used both an iPhone and an iPad to access the account

20   and sent himself the 110 emails with attachments.

21       Q.  How about with respect to Miss Youmans?

22       A.  Her laptop synced and her desktop.

23       Q.  Which laptop?  I think you identified multiple;

24   correct?

25       A.  Yeah.

1    Q.  Which -- you can give me the evidence item

2    number that's listed on Figure #1, if you could, please.

3    A.  Number 9.  9 was the desktop.

4    Q.  Mr. Birnbach, maybe this will help.  On

5    Figure 1 the evidence item numbers contained on the far

6    right-hand side of the first column there which devices

7    by number there are synced?  And this is with respect to

8    Robin Youmans.

9    A.  Do you want the full number or just the last?

10   Q.  Just the last digit will be fine.

11   A.  -9.

12   Q.  Is synced with what device?

13   A.  Was synced with email.

14   Q.  And 9 is Seagate, 160 GB 3.5" HDD, Robin;

15   correct?

16   A.  Yes.  Yes.

17   Q.  That's the hard drive of something; correct?

18   A.  That's the hard drive that came out of her

19   desktop.

20   Q.  Okay.  So the hard drive connected with her

21   desktop is synced to which device?

22   A.  Is synced to the Exchange mail server, to her

23   mail account.

24   Q.  So to be able to send something from that

25   desktop would you not have to be physically present at

1    the desktop?

2         A.   No.  She's not sending it from the desktop.

3    She is accessing her Exchange account from a device.

4    The artifact of that access in sending of an email

5    appears on the desktop through ActiveSync.

6         Q.   Which device did she send these emails through

7    that was actively synced with her desktop?

8         A.   We don't know.

9         Q.   So you can't tell me whether or not it was an

10   iPhone or another laptop that's contained in Figure #1;

11   correct?

12        A.   That's correct.

13        Q.   But you know that it was sent from one of these

14   devices; correct?

15        A.   Not necessarily.  It could have been sent from

16   a device that we haven't had access to.  It could have

17   been sent from any device that we set up with ActiveSync

18   to get to her email account through Exchange.

19        Q.   If someone had Robin Youmans' or Bill Oswald

20   for that fact had their Allied Portables Microsoft

21   Exchange email --

22        A.   And their password.

23        Q.   -- and their password and it was synced to this

24   desktop at Allied Portables, then these emails could

25   have been accessed and forwarded and sent; correct?

1      A.   If someone had the user name and password of a

2  given account, they could access the email server, yes.

3      Q.   And as we sit here today, you don't know which

4  of these devices initially accessed these emails and

5  forwarded through the desktop that was at Allied

6  Portables; correct?

7      A.   That's correct.

8      Q.   Do you know who accessed those emails?

9      A.   We would expect it would be the owner of the

10  account, the user of the account, the person that had

11  the credentials to that account because we weren't given

12  any evidence or any suggestion to the contrary.

13      Q.   But you don't know that; correct?

14      A.   Correct.

15      Q.   So you don't know whether or not anyone at

16  Allied Portables shared that sort of information log-in

17  and password information; correct?

18      A.   We do not.

19      Q.   Now you say that these were sent from an Allied

20  Portables Microsoft Exchange account to where?  This is

21  with respect to Robin Youmans.

22      A.   They were sent to ryoumans3458@gmail.com.

23      Q.   Did you perform a review of Miss Youmans' gmail

24  account?

25      A.   No.

1  Q. Why not?

2  A. Didn't have access to it.

3  Q. Was it requested?

4  A. No.

5  Q. So were you able to confirm that the gmail

6 account of Robin Youmans received these 16 emails and

7 440 attachments?

8  A. Yes, because if it hadn't, it would have kicked

9 back some type of message to the sender, which also

10 through ActiveSync would have appeared on the desktop.

11  Q. Some sort of too large to send and failure;

12 correct?

13  A. Correct.

14  Q. I'd like to show you what we'll mark as Exhibit

15 2.

16   (Exhibit 2 marked for identification.)

17   And I'll have you ask if you can identify this

18 document for me, please?

19  A. It is a Supplemental Affidavit Of John Noble In

20 Support Of Plaintiff's Second Verified Motion For

21 Preliminary Injunction.

22  Q. Do you know who John Noble is?

23  A. I understand him to be an investigator.

24  Q. And how do you understand him to be an

25 investigator?

1    A.  Through conversation with my client's counsel,

2  my counsel, Mr. Coleman.

3    Q.  And do you know whether or not Mr. Noble ever

4  provided testimony in this case?

5    A.  I do not know.

6    Q.  So you have never reviewed testimony if he did;

7  correct?

8    A.  I have not.

9    Q.  Have you ever seen this document before?

10    A.  I do not believe I have.

11    Q.  Did you ever request documents that Mr. Noble

12  previously executed or prepared in conjunction with this

13  case?

14    A.  No.

15    Q.  So you know who John Noble is though; correct?

16    A.  It's my understanding he is an investigator.  I

17  do not know the man.

18    Q.  If you can turn to Page 6 of 11 of deposition

19  Exhibit 2.  I will let you read that paragraph and then

20  let me know when you are finished, please.

21        MR. COLEMAN:  Paragraph 16, counsel?

22        MR. GIFT:  Yes, yes, of page 6 of 11.

23    A.  Okay.

24    Q.  Paragraph 16 references 14 emails; correct?

25    A.  Correct.

1    Q.   What's the date identified on those emails?

2    A.   8-30-14.

3    Q.   The same date that you recognized in your

4    report as the date that emails 16 emails with 440

5    attachments were sent from Robin Youmans' Microsoft

6    Exchange account to her gmail account; correct?

7    A.   Correct.

8    Q.   And yet this supplemental affidavit lists 14

9    emails; correct?

10    A.   Correct.

11    Q.   Do you know why there's a difference in between

12    these emails?

13    A.   I don't.

14    Q.   Do you know if you and Mr. Noble examined the

15    same devices?

16    A.   I don't know what Mr. Noble did.

17    Q.   But you have chain of custody of several

18    devices that are listed in Figure #1 of your report

19    though; correct?

20    A.   Correct.

21    Q.   That were provided to Sylint Group from John

22    Noble?

23    A.   Correct.

24    Q.   And used in preparation of your report;

25    correct?

1     A.  Correct.

2     Q.  So you don't know whether or not John Noble

3  ever reviewed any of those devices on Figure #1;

4  correct?

5     A.  I do not know what Mr. Noble did.

6     Q.  If you can turn to page 7 of 11, paragraph 17,

7  if you can read that and let me know when you're

8  finished.

9     A.  Okay.

10     Q.  Did you see any unsent or failed to send

11  notifications?

12     A.  We did.

13     Q.  From the desktop computer?

14     A.  We did.  Not from the desktop computer.

15     Q.  From which device?

16     A.  We saw artifacts of emails that failed to send

17  that were on the desktop computer.  Whether or not they

18  were sent from the desktop computer we don't know.

19     Q.  Consisting of what?

20     A.  Messages that were too large.

21     Q.  Were those identified in your report?

22     A.  No.

23     Q.  Why not?

24     A.  We didn't think they were relevant.

25     Q.  Were they sent on August 30th of 2014 from

1    Robin Youmans' Microsoft Exchange account at Allied

2    Portables to her gmail account?

3        A.   I believe they were attempted, yes.

4        Q.   So they were attempted to be sent?

5        A.   Uh-huh.

6        Q.   But you can't verify whether or not they

7    actually were sent; correct?

8        A.   Well, if they -- if they didn't send, they

9    would be an artifact as Mr. Noble suggests.

10       Q.   Which could explain the discrepancy between the

11   14 emails he identifies and the 16 you identify in your

12   report; correct?

13       A.   I would not begin to surmise why there's a

14   difference between my report and Mr. Noble's.

15       Q.   And the scope of your report, correct me if I'm

16   wrong, is to perform a forensic analysis of the devices

17   contained on Figure #1 of your report; correct?

18       A.   Correct.

19       Q.   And provide an opinion as to the emails that

20   were sent from one of these devices listed in Figure #1

21   on August 30th of 2014; correct?

22       A.   That would have been within the scope of our

23   engagement, yes.

24       Q.   The fact that emails were attempted to send but

25   didn't actually send is that relevant to your scope of

57

1    review and expert analysis in this report?

2         A.  I don't think terribly, no.

3         Q.  Which is why it's not included in here;

4    correct?

5         A.  Correct.

6         Q.  So if there were unsent emails that you

7    apparently discovered but didn't report in your report

8    here, correct?

9         A.  Uh-huh.

10        Q.  If there were, -- strike that.

11            Did you examine Allied's server to make a

12   determination whether or not these emails were actually

13   sent?

14        A.  No.

15        Q.  Why not?

16        A.  Because we had evidence that they were sent on

17   the desktop that we did analyze.

18        Q.  Through the email sync; correct?

19        A.  ActiveSync, yes.

20        Q.  ActiveSync.  Would a review of Allied's server

21   or network assisted in your examination for purposes of

22   this report?

23        A.  Possibly, if they had been preserved.  But

24   since there was active activity are those devices and

25   the activity of the business continued to operate we

1    didn't feel it would be much relevant on there for us

2    and would basically just create a lot of distractions,

3    other than getting to relevant material.

4        Q.  So it could have possibly had relevant

5    information to your expert opinion and report; correct?

6        A.  We don't know.

7        Q.  Because you didn't examine it?

8        A.  Correct.

9        Q.  Okay.

10       A.  It would not have contained anything that would

11   have contradicted our findings.

12       Q.  And your findings are what?

13       A.  As we report.

14       Q.  In the expert report here as deposition

15   Exhibit 1; correct?

16       A.  Correct, yes.

17       Q.  If you found emails from Robin Youmans'

18   Microsoft Exchange account to her gmail account that

19   didn't send, should there be some explanation in here or

20   some potentially forwarded email language in your

21   report?  Are you -- I will let you answer.

22       A.  No.

23       Q.  So you just identified what you found was

24   forwarded; correct?

25       A.  Correct.

1      Q.   And you determined that through the ActiveSync?

2      A.   We determined that by doing a forensic analysis

3   of the hard drive that was contained in the desktop used

4   by Robin at Allied.

5      Q.   Before she was terminated?

6      A.   Used by her, yes, during her employment.

7      Q.   Was anybody else using this desktop computer?

8      A.   We don't know.

9      Q.   After August 29?

10     A.   Yes.

11     Q.   After August 30?

12     A.   Yes.

13     Q.   Do you know who?

14     A.   I don't recall.

15     Q.   So there were other users on this desktop?

16     A.   With other user accounts, correct.

17     Q.   You didn't find a single instance of a sign-on

18  from Robin Youmans' account on this desktop; correct?

19     A.   I don't recall.

20     Q.   How about Bill Oswald?

21     A.   On this machine or on other machines?

22     Q.   On this machine.

23     A.   I don't recall.

24     Q.   Do you know whether or not his iPad or iPhone

25  was actively synced with this desktop?

1    A.  Yes, but not with this desktop with his email
2    account.
3    Q.  And how about Robin Youmans?
4    A.  We don't know.
5    Q.  Do you know if there is any allegations of
6    trespassing that have been raised by the plaintiffs in
7    this case against Robin Youmans?
8    A.  I'm not aware of any.
9    Q.  There is no remote access associated with any
10   of these devices; correct?
11   A.  There may be.  Allied had a cloud storage
12   solution called Livedrive, which would have allowed
13   someone to remotely access data, if they had the
14   Livedrive credentials.
15   Q.  Did you find any evidence of access to this
16   Livedrive in your forensic analysis of these devices in
17   this report?
18   A.  We did.
19   Q.  Which devices?
20   A.  The Allied laptop used by Miss Youmans.  It was
21   reported to us it wasn't surrendered by her until
22   August 18th of 2015.  We found that there were artifacts
23   identified on the computer consistent with that device
24   being connected to the Livedrive storage account on
25   August 1, 2014.

1      Q.   And what artifacts led you to this conclusion

2   in your report?

3      A.   We found an unallocated space, which means in

4   erased or deleted files, more specifically deleted

5   files, artifacts related to a web access to a

6   livedrive.com log-in, a portal and backup.

7      Q.   Which account logged in to this Livedrive?

8      A.   We don't know. all we know is that it was

9   connected from that particular laptop.

10     Q.   Do you know who connected from that particular

11  laptop to the Livedrive?

12     A.   Do not.

13     Q.   They would need a log-in and a password;

14  correct?

15     A.   Correct.

16     Q.   To log in?

17     A.   Correct.

18     Q.   Do you know whether or not anyone at Allied

19  Portables accessed the premises on August 30th of 2014?

20     A.   I do not.

21     Q.   Is it possible that someone else could have

22  logged on to this computer using Robin Youmans'

23  credentials?

24     A.   It's possible.

25     Q.   Did you identify that possibility in your

1    expert report?

2        A.  If I recall correctly, we looked at the header

3    path of the emails, which would tell us the route those

4    emails took, and did not find anything that would

5    indicate that they were internal.

6        Q.  And by internal you mean what?

7        A.  Sent from within Allied Portables.

8        Q.  So it was sent from another device; correct?

9        A.  Another device.

10       Q.  And transmitted through the desktop at Allied

11   Portables?

12       A.  Not through the desktop, the Exchange server

13   that would be synced to the desktop.

14       Q.  And which device in Figure 1 was this initiated

15   from?

16       A.  Again, I told you before, I'll repeat it, we

17   don't know.

18       Q.  And who reported to you that Robin Youmans was

19   terminated from Allied Portables on August 29 of -- your

20   report says 2016, but -- who reported that to you?

21       A.  It should be, of course, 2014.

22       Q.  It is on page 3 there.

23       A.  Mr. Coleman.

24       Q.  That is just a typographical error?

25       A.  That is correct.

1   Q.  It's August 29 of 2014?

2   A.  Correct.

3   Q.  And Mr. Coleman reported that to you; correct?

4   A.  Yes.

5   Q.  Do you have any factual circumstances

6   surrounding Miss Youmans' termination from Allied

7   Portables that was provided to you?

8   A.  No.

9   Q.  So you were just told that she was terminated

10  on August 29, 2014, and look on these devices and see

11  whether or not she accessed any of these afterwards;

12  correct?

13  A.  Yes.

14  Q.  And do you know in what capacity she was

15  terminated from Allied Portables on that date?

16  A.  I do not.

17  Q.  Whether or not she was just as an employee?

18  A.  I have no knowledge.

19  Q.  Just that she was terminated and she had no

20  access; correct?

21  A.  Correct.

22  Q.  No authorized access?

23  A.  That would be correct.

24  Q.  Why weren't those facts indicated in your

25  report?

1      A.  I think we did reference it.  We referenced it

2  in several spots.

3      Q.  Can you tell me where?

4      A.  Yeah, in paragraph -- second paragraph page 3

5  it was reported that her date of termination from Allied

6  was August 29, should be corrected to 2014, the day

7  prior to the activities.

8      Q.  But not who reported that to you; correct?

9      A.  Correct.

10     Q.  Why not?

11     A.  No reason.

12     Q.  So anybody could have reported this to you and

13  that's what you started your basis on; correct?

14     A.  No, we are engaged by counsel.  We are working

15  for counsel as private investigators.  So we get

16  relevant contextual information.

17     Q.  Do you know who at Allied Portables was charged

18  with operating the company's computer systems?

19     A.  I do not.

20     Q.  What is a computer system?

21     A.  It's a vague question.  I will try to give you

22  a vague answer.  It can be a combination of computer

23  devices and peripherals interconnected through one or

24  more networks.

25     Q.  It's pretty vague, Mr. Birnbach.

1    A.  Well, the question is pretty vague.  I

2 apologize, counselor.

3    Q.  It's okay.  What is computer assets?

4    A.  Those would be -- again loosely defined, those

5 would be devices and/or repositories that would belong

6 to an organization.

7    Q.  That doesn't include a network or server;

8 correct?

9    A.  No, those would be computer assets as well.

10    Q.  Can you turn to page 6 of your report, please?

11    A.  Sure.

12    Q.  In there you identify Allied computer assets;

13 correct?

14    A.  Yes.

15    Q.  Why isn't that term defined in this report?

16    A.  Well, I think it was in that the Exchange mail

17 server, the content of that mail.  Clearly computer

18 assets would also include intellectual property that

19 sits in digital format that would belong to the Allied

20 organization.

21    Q.  But in this case computer assets do not include

22 a network or server; correct?

23    A.  We haven't necessarily said that.  It would

24 include -- again, if you want to get into semantics, the

25 mail server is, in fact, a server.  Exchange has a mail

1    server and it operates on a mail server, so that would

2    be a server.

3        Q.  Is that network or server located at Allied

4    Portables?

5        A.  I don't recall.

6        Q.  Did you review Allied Portables' network or

7    server?

8        A.  We did not, since there were sufficient

9    artifacts on the devices we had been given.

10       Q.  Do you know who told Robin Youmans that she was

11   not permitted to access these devices on August 30?

12       A.  I do not.

13       Q.  Did you assume any other facts in this report,

14   in the preparation of your report, with respect to Robin

15   Youmans' termination?

16           MR. COLEMAN:  Object to form.

17       A.  Can you be more specific?

18       Q.  Other than her termination date, was there any

19   other facts that you were told by counsel to assume in

20   the preparation of your expert report?

21       A.  We were advised that the laptop wasn't

22   surrendered by her until August 18.

23       Q.  Of what year?

24       A.  Of 2015.

25       Q.  Anything else?

1    A.  No, sir.

2    Q.  Do you know whether or not Allied Portables

3  changed any of its passwords after August 29th of 2014?

4    A.  I know they changed their passwords.  I don't

5  know what date.

6    Q.  What programs were those passwords changed on?

7    A.  The user name and passwords of the various user

8  accounts were changed.  Again, I don't recall the date

9  that that occurred.

10   Q.  Was Robin Youmans' changed?

11   A.  I don't recall.

12   Q.  Was Bill Oswald's changed?

13   A.  I don't recall.

14   Q.  Speaking generally, to change a log-in and

15  password information of a Microsoft Exchange email at

16  Allied you'd have to have the initial log-in and

17  password; correct?

18   A.  No, you could have an administrator access.

19  And with administrator access you can go ahead and just

20  force the next time the user logs in they would have to

21  reset a password.

22   Q.  And who at Allied Portables had administrator

23  access?

24   A.  I don't know.

25   Q.  Someone did?

1     A.   It was my understanding they used an outside IT

2   company for support.  Their exact duties I do not know.

3     Q.   Anyone else?

4     A.   I am not aware.

5     Q.   So you don't know who changed the passwords?

6     A.   Correct.

7     Q.   You don't know when?

8     A.   Correct.

9     Q.   Do you know whether Allied Portables had any

10   policies restricting access to the Microsoft Exchange

11   email account?

12     A.   I do not.

13     Q.   As of any date?

14     A.   I do not.

15     Q.   Prior to August 31st of 2014 do you know

16   whether or not Allied had a server?

17     A.   They had a server running their Exchange mail.

18   Whether it was virtual or not I don't know.

19     Q.   How do you know that they had a server running

20   their Exchange mail?

21     A.   Because you have to run Microsoft Exchange on a

22   server.

23     Q.   Where is that server located?

24     A.   I don't know.

25     Q.   Not Allied; correct?

1        A.  Don't know.

2        Q.  And a forensic analysis of these devices in

3   Figure 1 wouldn't tell you that?

4        A.  It might.

5        Q.  But it didn't here; correct?

6        A.  I don't know that we looked.  We didn't think

7   it was relevant.

8        Q.  Do you know if anybody at Allied Portables

9   rendered any of these devices listed in Figure 1 of your

10  report inaccessible to Robin Youmans?

11       A.  I do not know.

12       Q.  How about to Bill Oswald?

13       A.  I have no knowledge.

14       Q.  Don't know if anyone at Allied Portables

15  blocked or terminated their access to any of these

16  devices; correct?

17       A.  That's correct.

18       Q.  Do you know if anybody at Allied Portables told

19  Robin Youmans she could not access her Allied Portables

20  Microsoft account on August 30th of 2014?

21       A.  I do not know.

22       Q.  So as you sit here today, you don't know

23  whether or not Robin Youmans was or wasn't permitted to

24  access her Microsoft email Exchange account; correct?

25       A.  The information we received from Mr. Coleman

1     was she was terminated on the 29th, and that she should

2     not have had any further access past the date of

3     termination.  What she was told by whom, when, I have no

4     knowledge of.

5          Q.  Did you find any data in your forensic analysis

6     that was performed with respect to your report that

7     reflected Robin Youmans accessing Allied's computer

8     system after August 30th of 2014?

9          A.  Again, we did find that on the laptop

10    Miss Youmans used on September 1st of 2014 the device

11    was connected to the Livedrive cloud storage account.

12         Q.  Was anything sent or received from that

13    Livedrive storage account on September 1, 2014?

14         A.  We don't know because a lot of data had been

15    deleted on that computer.

16         Q.  And that deleted data did that prevent you from

17    providing your analysis in this report?

18         A.  It hindered our ability to understand what may

19    have occurred using that computer.  But we were able to

20    identify certain artifacts consistent with connection to

21    Livedrive.

22         Q.  Which device was logged on on September 1st of

23    2014 to the Livedrive?

24         A.  It would have been the Allied laptop she used.

25    If you like, I can give you that number.

1      Q.   Which number on Figure 1?

2      A.   Bear with me a second.  It would have been -5.

3      Q.   Which is described as Dell, Latitude E6400,

4  Laptop, "Robin" -Allied; correct?

5      A.   Yes, sir.

6      Q.   And again I don't know if you answered my

7  question.  If you did, I apologize.  Was anything sent

8  or received from that device on September 1st of 2014?

9      A.   We didn't have any visibility into that.

10     Q.   Okay.  Is there anything else after August 30th

11  of 2014 that was sent or transmitted or received from

12  any of the devices listed on Figure #1 of your report?

13     A.   Yes.  Specifically several of these devices

14  were used by others at Allied after that date.  So, yes,

15  there are artifacts of use on many of these devices

16  after that date and time.

17     Q.   By Robin Youmans?

18     A.   By others.

19     Q.   So yes or no used by Robin Youmans after that

20  date?

21     A.   No, not used by Robin Youmans.  Well, let me

22  back up.  She was in possession of some of these things

23  is my understanding after August 29.  All right.  So she

24  was in possession of -5.  It's our understanding she was

25  in possession of that until August 18th of 2015.  So,

1    yes, there was indication of that device being used

2    after August 29th of 2014.

3         Q.   Any connection to the Allied network, Microsoft

4    network, sorry, Microsoft Exchange network?

5         A.   Other than what we have discussed, no.

6         Q.   On August 30th of 2014; correct?

7         A.   Correct, other than that, no.

8         Q.   Were there any other emails with attachments

9    sent by Robin Youmans on any of these devices listed in

10   Figure 1 after August 30, 2014?

11        A.   Were there other emails sent by her?

12        Q.   Yes.

13        A.   Yes, there were.  Were there other emails sent

14   by her from her Allied account?  No, there were not.

15        Q.   Which Allied account?

16        A.   Any Allied accounts.

17        Q.   Any of Robin Youmans?

18        A.   Correct.

19        Q.   After August 30th of 2014?

20        A.   Correct.

21        Q.   Understood.  On page 3 of 6 of your report at

22   the end of the second paragraph you identify that

23   Youmans had another device to access her emails; what

24   device are you referring to?

25        A.   Whichever device was used to go ahead and send

1    emails on the 30th that we discussed.

2        Q.  Which device listed on Figure #1 of your

3    report?

4        A.  We were not able to define which device.

5        Q.  Why not?

6        A.  Because a number of files had been deleted on

7    many of the devices and it may have occurred on a device

8    that's not listed on that list.

9        Q.  You didn't find any evidence of emails

10   forwarded from whatever other device beyond through this

11   desktop computer; correct?

12       A.  As relates to Miss Youmans, that's correct.

13       Q.  If Youmans, Miss Youmans, had possession of a

14   device that was listed in Figure #1 of your report

15   outside of the Allied premises, would that be able to be

16   considered a part of Allied's network?

17       A.  Possibly, yes.

18       Q.  Was it considered a part of Allied's network

19   for purposes of your report?

20       A.  The question is such that it could include wifi

21   access to the Allied Portables' environment from a

22   laptop outside of the facility.  Outside of the facility

23   would be you could sit in the parking lot and log on to

24   someone's network, if you had the wifi.  So to the

25   hypothetical that would be one possible answer.

1          Whether or not any of these devices that she

2     still had in her possession after the date of the 29th

3     could be connected to any Allied computer assets the

4     answer is yes.

5          Q.   How about Allied's computer network?  That's

6     what I limited my question to.

7          A.   If the network is understood to contain the

8     Exchange server, the answer is yes.

9          Q.   Does the -- is the Allied network for purposes

10    of your report considered to contain the Microsoft

11    Exchange email account?

12         A.   The Microsoft Exchange server, yes.

13         Q.   Is that listed as one of the devices in Figure

14    #1?

15         A.   No.

16         Q.   Okay.  But you can run a forensic analysis on

17    this; correct?

18         A.   We can run a forensic analysis on the path the

19    email took and the various IP addresses and platforms it

20    traversed to get from the sender to the receiver.

21         Q.   Let's turn to page 4 of your report.  In

22    Figure 3 you identify emails that were allegedly

23    exchanged between Youmans and Allied customers; correct?

24         A.   Correct.

25         Q.   And which device did you obtain the email

1    that's contained in Figure #3 from?

2         A.  I don't recall.

3         Q.  It's not referenced in your report; correct?

4         A.  No.

5         Q.  Why not?

6         A.  No reason.  We had -- we had one device from

7    Miss Youmans that was attributed to GSP, which I assume

8    would be Garden.  I would have to confirm, but it's my

9    recollection it came from that device.

10        Q.  But you don't know; correct?

11        A.  I do not know positively, no.

12        Q.  In Figure 3 what is the email address that's

13   indicated next to the word Robin?

14        A.  Robin@gsportables.com.

15        Q.  That's not an Allied Portables email domain

16   name; correct?

17        A.  That's correct.

18        Q.  And you don't know whether or not this was

19   pulled from which device in Figure 1; correct?

20        A.  I do not recall, no.

21        Q.  Now in Figure #3 you attached one email;

22   correct?

23        A.  Yes.

24        Q.  But yet the paragraph above it references

25   emails?

1       A.   Correct.

2       Q.   So there were other emails?

3       A.   Yes.

4       Q.   Were those identified in your report?

5       A.   No, we just said a sample.

6       Q.   Why this particular one?

7       A.   Popped up.  Nothing remarkable about it.

8       Q.   How many other emails did you identify?

9       A.   I don't recall.

10      Q.   Are they attached to your report?

11      A.   They are not.

12      Q.   Why not?

13      A.   They weren't requested by counsel.

14      Q.   Counsel requested that you put this particular

15   email in here?

16      A.   No, they did not.  We put this together and we

17   asked counsel if they wanted anything else and they said

18   no.

19      Q.   Who requested that you put this email into

20   Figure #3?

21      A.   That would have been a decision I would have

22   made.

23      Q.   What's the date of this email in Figure #3 of

24   your report?

25      A.   Sent date of November 3rd, 2014.

1       Q.  And so this wasn't included in any of the

2  emails that are referenced in paragraph 2 of page 3 of

3  your report; correct?

4       A.  That would be correct.

5       Q.  Do you know whether or not there were any

6  previous exchanges between robin@gsportables.com and

7  paverell@calusa-construction.com?

8       A.  I do not.

9       Q.  There could have been; correct?

10       A.  Correct.

11       Q.  Do you know whether or not anyone at Calusa

12  Construction contacted Miss Youmans or anyone at Garden

13  Street Portables and asked for the information that's

14  contained in the email attached to Figure #3 in your

15  report?

16       A.  I do not.

17       Q.  Is that something that would have changed you

18  from putting this into Figure #3 of your report?

19       A.  No.

20       Q.  Why not?

21       A.  My statement I think was fairly clear and

22  concise.  To me it was an illustration of an effort to

23  solicit business from one of Allied's clients.

24       Q.  Was that part of your scope of engagement from

25  Buchanan Ingersoll?

1      A.  It references the potential use of information

2  that Miss Youmans may have taken from Allied.

3          MR. GIFT:  Can you read that question back for

4      me, please?

5          (Record read.)

6      Q.  Can you answer that question for me, please?

7      A.  I believe it is.

8      Q.  That's why it's included in your report; right?

9      A.  Right.

10         THE WITNESS:  Would you mind if we take a few

11     minutes to grab some water?  Good time to break?

12         MR. GIFT:  Yeah, that's fine.

13         (Break.)

14  BY MR. GIFT:

15     Q.  Mr. Birnbach, Calusa Construction is identified

16  in the email as the recipient of the email in Figure #3

17  of your report; correct?

18     A.  That would appear to be so, yes.

19     Q.  Do you know if Calusa Construction is Allied

20  Portables' customer?

21     A.  I do not.

22     Q.  So then why in your descriptive sentence above

23  Figure 3 do you identify that "emails sent by Robin

24  Youmans to Allied customers" why did you reference

25  Allied's customers there?

1    A.  We may have seen something in the thousands of

2    files we look at that would relate to that file name,

3    that domain name I should say, but I don't recall

4    specifically.

5    Q.  Thousands of files that were sent to you the

6    month before the date on this report; correct?

7    A.  The thousands of files we reviewed in the

8    production of this report.

9    Q.  Which were provided to you in mid August of

10   2016; correct?

11   A.  Correct.

12   Q.  And the date of your report is September 22,

13   2016; correct?

14   A.  Correct.

15   Q.  So is this an assumption that you made?

16   A.  It is an observation of Miss Youmans attempting

17   to solicit business.  The specifics regarding why we

18   culled this out as a sample I don't recall.

19   Q.  But you identified emails sent by Robin Youmans

20   to Allied customers; correct?

21   A.  Correct.

22   Q.  And then you attached this email?

23   A.  That's correct.

24   Q.  You are referencing this email in that

25   description; correct?

1        A.   That is correct.

2        Q.   But you don't know whether or not Calusa

3    Construction is a customer of Allied Portables; correct?

4             MR. COLEMAN:   Object to form.

5        A.   I do not recall.

6        Q.   What is Livedrive?

7        A.   Livedrive is a cloud storage solution.

8        Q.   It's not an email server; right?

9        A.   No, it's for backing up files.

10       Q.   So you can't actually send or receive anything

11   through that, it's a backup; correct?

12       A.   Well, you could.  You could go ahead and park

13   data there and then you can go pull it down.  You can

14   back up the device, let's say your computer in your

15   office, and then that evening go home and pull that

16   backup down to your computer in your residence.

17       Q.   Did you see that occurrence within your

18   forensic analysis performed with respect to this report?

19       A.   All we saw was evidence of deleted files --

20   deleted artifacts I should say that are consistent with

21   the device being connected to Livedrive on September

22   1st, as I noted in my report.

23       Q.   Deleted files?

24       A.   That is correct.

25       Q.   But nothing actually sent or received through

1    --

2         A.  We did not have any visibility.

3         Q.  Does Allied Portables have a cloud-based

4    network?

5         A.  It uses certain services that are on the cloud,

6    which would be Livedrive.

7         Q.  What other services?

8         A.  I couldn't speak to others.

9         Q.  Is the Microsoft Exchange email account one of

10   these cloud based --

11        A.  It could be hosted, yes.

12        Q.  But you don't know either way?

13        A.  Correct.

14        Q.  Is that identified in this report?

15        A.  No.  Since we didn't look at that.  We looked

16   at the artifacts we had; that's what we reported on.

17        Q.  Do you know if Calusa Construction is a

18   customer of Garden Street Portables?

19        A.  I do not know.

20        Q.  Do you know whether or not Calusa Construction

21   is even in business?

22        A.  I do not know.

23        Q.  In Figure #4 on page 5 of your report what

24   device did you retrieve this email from?

25        A.  That would have been what we have numbered as

1    -12 in Figure 1.

2         Q.   Which is identified as a hard drive; correct?

3         A.   Correct.

4         Q.   Hard drive to what device?

5         A.   Coming from a machine Robin used as GSP.

6         Q.   A computer?

7         A.   Yes.

8         Q.   What makes you believe that the email was

9    originated from Allied Portables in Figure #4?

10        A.   I didn't say it was originated from -- well,

11   it's a file showing a receipt for

12   alliedportables.livedrive.com services

13        Q.   In Figure #4?

14        A.   I'm sorry.  I'm sorry, #4.  Yes, the Allied

15   Event Proposal Agreement.doc would signify to me that

16   that is an asset of Allied Portables.

17        Q.   Did you examine the attachment?

18        A.   We did.

19        Q.   Did you attach that to this report?

20        A.   We did not.

21        Q.   Why not?

22        A.   It was referenced.  It's certainly available,

23   if you'd like it.

24        Q.   Did you assume that it originated from Allied

25   because it was labeled Allied Event Proposal Agreement?

1          MR. COLEMAN:  Object.

2      A.  That was our first clue.  When we opened it up,

3  it was confirmed, yes.

4      Q.  But not attached to your report?

5      A.  Correct.

6      Q.  What's the relevance of the invoice attached as

7  Figure #5 in your report?

8      A.  It ties in with the fact that we later saw that

9  there was some connection again through deleted

10  artifacts on Miss Youmans' laptop.

11      Q.  What's the date indicated on that invoice in

12  Figure #5?

13      A.  It's 3-5-2014.

14      Q.  So an invoice from Ryan's Computer Shop for

15  Livedrive Backup Service dated March 5, 2014?

16      A.  Was found on Garden Street Portables' computer;

17  that's correct.

18      Q.  Do you know whether this was included as an

19  attachment as part of the 16 emails with 440 attachments

20  that were sent from Robin Youmans' Microsoft Exchange

21  email on August 30th of 2014?

22      A.  We do not know.

23      Q.  Do you know what was part of the attachments on

24  that date?

25      A.  We looked at some of the attachments, which I

1   think we identify on page 3, second paragraph noting the

2   titles of the emails.

3         Q.   Some but not all; correct?

4         A.   Correct.  We did not report on all of the --

5   nor did we look at all of the attachments.

6         Q.   Did you look at these attachments?

7         A.   Yes.

8         Q.   You physically opened up the attachments and

9   reviewed the contents of each; correct?

10        A.   That is correct.

11        Q.   Okay.  Did you determine in your report that

12  Robin Youmans prevented your forensic review of the

13  Allied Portables laptop?

14        A.   We noted that there was evidence of an

15  application called CCleaner.exe, which is frequently

16  used to delete data.

17        Q.   I think it was a yes or no question,

18  Mr. Birnbach.  If you would like, she can read it back.

19             THE WITNESS:  Would you please?

20             (Record read.)

21        A.   We did not say prevented.  We said found an

22  artifact consistent with potential obfuscation.

23        Q.   Potential?

24        A.   Potential.

25        Q.   So you don't know whether or not she did;

1    correct?

2         A.   On that particular device, no.

3         Q.   Does CCleaner.exe have any usage besides

4    deleting data from computers?

5         A.   Yes.

6         Q.   Can it be used as a maintenance tool?

7         A.   Yes.

8         Q.   What other uses can it be used for?

9         A.   It has a number of functions.  However, as an

10   investigator, I can tell you we often find it when it

11   has been used to intentionally obfuscate activities on a

12   machine.

13        Q.   Potentially; correct?

14        A.   Potentially.

15        Q.   Do you know whether CCleaner was installed on

16   this particular device from the factory?

17        A.   It would not have come from the factory.

18        Q.   That's an additional purchase that you put on

19   to the --

20        A.   Download it for free, but you get it somewhere.

21   It is not offered by any of the manufacturers, to my

22   knowledge.

23        Q.   It has multiple purposes; correct?

24        A.   Correct.

25        Q.   One of them being maintenance?

1          MR. COLEMAN:  Object to form.

2     Q.  Correct?

3     A.  Yes.

4     Q.  Did you determine that CCleaner was run on this

5  laptop?

6     A.  We were able to identify that CCleaner was last

7  accessed on May 20, 2015.  That would suggest that the

8  application was opened.  Beyond that we don't know what

9  occurred.

10    Q.  Why not?

11    A.  Because we don't have that level of visibility.

12    Q.  You don't know whether or not it ran on that

13  date; correct?

14    A.  Correct.

15    Q.  That CCleaner program?

16    A.  Correct.

17    Q.  Were you able to perform a full digital data

18  forensic analysis of all of the devices contained in

19  Figure 1 of your report?

20    A.  No.

21    Q.  Which ones were you not able to perform a full

22  digital data analysis on?

23    A.  Item -15, the Apple iPhone 4, had evidence that

24  all contents and settings had been erased.  On June 29,

25  2015 it was evidenced by an obliterated file, which is a

1    unique artifact that occurs when the phone is completely

2    reset.

3        Q.  Can you still look at emails that were sent to

4    and from that phone?

5        A.  No.

6        Q.  But if it was -- I forget what you called it,

7    ActiveSync engaged with the Allied Portables desktop?

8        A.  Resetting would have done away with all of that

9    ActiveSync.  It would have cancelled all of the users

10   credentials that would have been stored in the phone.

11       Q.  And what other device did you identify that you

12   could not perform a full digital data forensic analysis

13   of?

14       A.  We also identified there were a large number of

15   deleted messages on the iPhone 5S, which I want to say

16   was -16 under Figure 1.  It had 99,652 deleted chat

17   messages and 17,705 deleted text messages.

18       Q.  And do you know when those deleted chat

19   messages and deleted text messages were actually

20   deleted?

21       A.  No.

22       Q.  That's not indicated in your report; correct?

23       A.  Correct.

24       Q.  Just that they were in general; correct?

25       A.  Correct.

1     Q.  Is that a normal occurrence that you see in

2  performing forensic analysis of data that people delete

3  text messages and chat messages?

4     A.  It was an unusually large number.

5     Q.  As compared to what other numbers do you see?

6     A.  Typically we'll see a much smaller number of

7  messages in total.  Without anything quantitative it

8  just struck as being a very large number of messages to

9  be deleted.

10     Q.  With respect to the last paragraph on page 5 of

11  your report, what artifacts did you identify in your

12  forensic review of the Allied Portables laptop that

13  showed the device was connected to Livedrive storage

14  accounts?

15     A.  We found data in unallocated space, which would

16  signify the files had been deleted or the artifacts I

17  should say had been deleted of web browser activity

18  going to livedrive.com on 9-1-2014.

19     Q.  Where is that identified in your report?

20     A.  Where you referenced it, on the bottom of page

21  5.

22     Q.  Unallocated space is referenced in your report?

23     A.  No, just the fact that there are artifacts.

24     Q.  But they are not attached to the report?

25     A.  Correct.

1      Q.  Listed in the report?

2      A.  Correct.  They are certainly available, if you

3  would like them.

4      Q.  Do you know if Allied Portables used these

5  artifacts?

6      A.  Well, again, this was on a laptop that is our

7  understanding Miss Youmans had in her possession on that

8  date.

9          MR. GIFT:  Can you read the question back,

10  please?

11          (Record read.)

12      A.  I need you to explain that further for me.

13      Q.  The artifacts that you identified were on this

14  computer do you know whether or not those were ever used

15  by Allied Portables?

16      A.  It's not something that they would have used.

17  It would be the result of going to a web page.  So if

18  you were on your browser and you went to a web page

19  cars.com, you would see certain artifacts in cache files

20  that looked at where you had gone, and that's basically

21  what these were.

22      Q.  So they are not emails; correct?

23      A.  No.

24      Q.  Or text messages or anything like that?

25      A.  It is machine code that is stored that looks at

1    where a person may have visited using a browser.

2        Q.  And how would that assist with your forensic

3    analysis here?

4        A.  Well, it gives us again artifacts that show

5    that someone on this machine on that date connected to

6    the Livedrive account.  And we showed immediately in

7    Figure 5 that Miss Youmans was in possession of

8    information regarding that account.

9        Q.  And she was in possession of this information

10   contained in Figure #5 on what date?

11       A.  I couldn't tell you offhand.  I could find it,

12   but I don't know.  It's information we have, but I don't

13   know.

14       Q.  Prior to August 30th do you know that?

15       A.  I don't know.

16       Q.  Okay.  Can you explain to me what science, if

17   any, was used in generating your report?

18       A.  Well, we use certain tools that help us

19   identify digital data that's left behind from various

20   operations.  Sending an email leaves behind certain

21   information.  We look to see the information, the header

22   of an email, that tells who the sender was, who the

23   recipient was, and the path it took to get there; that's

24   one example.

25           We use our tools to help us extract information

1       from mobile devices, cell phone, iPad.  And those tools

2       also identify for us files that have been deleted.

3              We use yet other tools that help us understand

4       where somebody went in terms of browsing.

5              So when we talk about scientific, there are

6       technical tools we use to help extract data, this huge

7       amount of data, to put it in manageable categories, so

8       that we can then use some human intelligence to look at

9       it and try to identify some patterns.

10      Q.   What technical tools did you use here?

11      A.   I believe it's written in our report on the

12      first paragraph page 2, X-ways Forensics 18.9, Magnet

13      Forensics Internet Evidence Finder and Cellebrite.

14      Q.   Is a reasonable degree of scientific certainty

15      a standard that you must abide by when performing a

16      forensic analysis?

17      A.   It is.

18      Q.   What other standards do you have to provide --

19      or abide by when performing a digital data forensic

20      analysis?

21      A.   There are standards related to proper evidence

22      handling, standards related to the use of tools, the use

23      of information.  There are laws that govern our

24      activities as private investigators.  There are a number

25      of different standards, if you will.

1       Q.  Are any of those standards referenced in your

2  report?

3       A.  No.

4       Q.  Why?

5       A.  They are -- I would think that the standards

6  governing private investigation are understood, much

7  like the standards governing attorneys are understood by

8  people in the field.  So we don't necessarily include

9  them.

10       Q.  What about the use of information as you

11  described it?

12       A.  Use of information, can you be more --

13       Q.  Yeah, you identified the use of tools and the

14  use of information as standards that you abide by when

15  performing a digital data forensic analysis.

16       A.  Right.

17       Q.  Is there a specific number or treatise that

18  tells you what standards you need to abide by when using

19  these tools or using this information?

20       A.  I'm not sure I'm following your question.

21       Q.  Let me ask you with reference to the proper

22  evidence handling did that include chain of custody?

23       A.  It does.

24       Q.  Is there a specific treatise or number or

25  regulation that you have to abide by proper evidence

1    handling when performing a digital data forensic

2    analysis?

3        A.  There are generally accepted standards, if you

4    will, for maintaining evidence.

5        Q.  And those are -- excuse me, go right ahead.

6        A.  Just in terms of keeping it identified,

7    isolated.  We don't work from the original device.  We

8    make a forensic copy of everything we are given.  And

9    that becomes an EO1 document, EO1 file, which is a

10   standard evidentiary file that most investigators in law

11   enforcement use.  We then work from that file.  So the

12   original evidence or what we receive as original

13   evidence is always preserved.

14       Q.  And that generally accepted standard with

15   respect to proper evidence handling is not referenced

16   once in your report; correct?

17       A.  Correct.

18       Q.  Why?

19       A.  We consider it to be understood.  And we're

20   happy to discuss it, but we consider it to be

21   understood.

22       Q.  What other standards are you to abide by when

23   performing a forensic analysis?

24       A.  We maintain chain of custody, we maintain

25   documentation, we certainly maintain confidentiality,

1    none of which I believe need to be fully articulated in

2    the report, if they are understood as being part of the

3    function that we perform.

4        Q.  With respect to that chain of custody, let's

5    turn to Exhibit B the first evidence log there.

6        A.  Right.

7        Q.  This identifies that the date of intake was

8    August 15 of 2016; correct?

9        A.  Correct.

10       Q.  And then it's signed by Mathew Baptiste of

11   Sylint Group; correct?

12       A.  Correct.

13       Q.  Where was this device that's identified in the

14   first evidence log prior to August 15 of 2016?

15       A.  We received it from Rhonda Reid.

16       Q.  On what date?

17       A.  What date did we receive it?

18       Q.  From Rhonda Reid.

19       A.  It was processed into evidence on 8-15.  We

20   would have photographs of the package.  We would have

21   photographs of the label of the package.  We would have

22   photographs of us unwrapping the package.  So we have

23   full documentation of what we received, what condition

24   it was in and what it was.

25       Q.  Is that referenced or attached to your report?

1       A.   It is not.

2       Q.   So prior to August 15 of 2016 where was the

3  device that is reflected on evidence log 1 of Exhibit B?

4       A.   Immediately prior to our receiving it it was in

5  transit.

6       Q.   And prior to that?

7       A.   It was with Miss Reid.

8       Q.   Who is an employee of Buchanan Ingersoll;

9  correct?

10      A.   That is our understanding, yes.

11      Q.   Do you know what date she received it?

12      A.   I do not.

13      Q.   Do you know who she received that from?

14      A.   I do not.

15      Q.   So you have a chain of custody from August 15

16  through present; correct?

17      A.   Correct.

18      Q.   Nothing before then?

19      A.   We would not have had care, custody or control.

20  The only thing we might have would be some documentation

21  from Mr. Noble, if he provided any.  And he may or may

22  not have.

23      Q.   So you don't know whether or not Mr. Noble

24  provided this?

25      A.   Correct.  As these are DVDs --

1    Q.  The first three are DVDs as evidence logs in

2    Exhibit B; correct?

3        A.  None of which was relied upon for our report.

4        Q.  How about the fourth one, the Dell Latitude

5    E6400, was that relied upon in your report?  It's the

6    8-22-16.

7        A.  8-22-16.  Dell Latitude -5.  Yes, it is.  We

8    received that from Mr. Noble.

9        Q.  On what date?

10       A.  8-22.

11       Q.  Of '16?

12       A.  I'm sorry, yes, 8-22-16, yes.

13       Q.  So prior to August 22nd of 2016 where was the

14   Dell Latitude E6400 laptop?

15       A.  In Mr. Noble's possession?

16       Q.  How do you know that?

17       A.  He was the sender of the package to us.

18       Q.  Do you know when he received the device?

19       A.  We do not.

20       Q.  So prior to August 22nd of 2016 you don't know

21   when Mr. Noble received the laptop; correct?

22       A.  That is correct.

23       Q.  How about on the Hitachi 160 GB hard drive do

24   you know when you received that from Mr. Noble?

25       A.  That was contained within the prior item -5.

1    It would have been on the same date.

2         Q.  Which is why it's not signed by Mathew

3    Baptiste?

4         A.  It's one item.  We subset the items out so that

5    we can go ahead and maintain control of all of the

6    repositories.  It's not unusual to get computers with

7    five or more hard drives in them.

8         Q.  With respect to the Dell Lenovo ThinkPad 540,

9    do you know when you received that from Mr. Noble?

10        A.  The date is 8-22-2016.

11        Q.  And do you know when he received the Dell

12   Lenovo ThinkPad?

13        A.  I do not.

14        Q.  Do you know when he received the 500 GB 2.5

15   Hard Drive?

16        A.  I would expect it was in the Dell Lenovo that

17   we took it out of, but I do not know when he received

18   it.

19        Q.  Is that why there's no chain of custody there?

20        A.  Yes.

21        Q.  And the thumb drive do you know when you

22   received that document -- or that device, sorry?

23        A.  The thumb drive --

24        Q.  It's the SanDisk 4 GB USB thumb drive.

25        A.  What page are you on, sorry?

1      Q.   7.

2      A.   8-22-2016.

3      Q.   Do you know who possessed that device prior to

4    that date?

5      A.   Mr. Noble.

6      Q.   Do you know when he gained possession of that

7    device?

8      A.   I do not.

9      Q.   Do you know who he gained possession of that

10    device from?

11     A.   I do not.

12     Q.   And the next evidence log PNY 16 GB USB thumb

13    drive do you know when you received that from Mr. Noble?

14     A.   8-22-2016.

15     Q.   Do you know where that device was prior to that

16    date?

17     A.   I do not.

18     Q.   Do you know when Mr. Noble's office received

19    this device?

20     A.   I do not.

21     Q.   Do you know what he did with the device when

22    they received it?

23     A.   I do not.  It would only be conjecture.  I do

24    not.

25     Q.   So the only knowledge that you have with

1    respect to what's contained on these devices in

2    Exhibit B is with respect to the date that it was

3    received by you through present; correct?

4         A.  Yes, sir, correct.

5         Q.  Nothing prior to the dates that are indicated

6    on these evidence logs?

7         A.  Other than some information as reported

8    recorded on the report, which noted that we received

9    information from Mr. Coleman and his office that the

10   item is noted on -- Allied laptop was not surrendered

11   until August 18, 2015.

12        Q.  The Seagate 160 GB Hard Drive Labeled Robin do

13   you know when that was possessed by Mr. Noble?

14        A.  I do not.

15        Q.  You don't know when he received that; correct?

16        A.  I do not.

17        Q.  Or what he did with that?

18        A.  Correct.

19        Q.  But you knew that Mr. Noble obtained possession

20   of this prior to you taking possession of it; correct?

21        A.  That is correct.

22        Q.  Did you ask Mr. Noble if he had ever done a

23   report?

24        A.  I did not speak with Mr. Noble on the matter.

25        Q.  Did anybody?

1    A.   I believe Matt Baptiste probably spoke with him

2    to arrange getting this, but I don't put much

3    credibility in looking at things other people have done.

4    I think it can sway your opinion, move you in a certain

5    direction, so we tend to not look at those.

6        Q.   It wouldn't help with your examination here;

7    correct?

8        A.   Correct.

9        Q.   Given the month you had to perform a forensic

10   analysis of thousands of documents; correct?

11       A.   Correct.

12       Q.   I believe you explained before what computer

13   assets is comprised of.

14       A.   Uh-huh.

15       Q.   Does that include Allied Portables' network?

16       A.   To the extent the network exists, yes.

17       Q.   Do you know if it exists?

18       A.   We know that they have a network that allows

19   them to connect their computers through an internet

20   appliance that allows them to get out to the internet.

21   The configuration of how those computers interact with

22   each other we do not know.

23       Q.   Do you know the date that that was established?

24       A.   We do not.

25       Q.   Why isn't this term defined in your report?

1      A.   Which term is that?

2      Q.   Computer assets.

3      A.   I don't know that it required definition.   To

4   me it seems to be well understood, but I am happy to

5   discuss it.

6      Q.   Is computer assets comprised of the devices

7   that are contained in Figure #1?

8      A.   Partially.

9      Q.   What else?

10      A.   The wifi network, the physical wiring, the

11   internet connection, the Exchange server wherever it may

12   be located hosting mail, a Livedrive, USB items, thumb

13   drives, things that we haven't identified those would

14   all be considered computer assets and the matter

15   contained therein.

16      Q.   And that was part of the scope of your

17   engagement with Buchanan Ingersoll; correct?

18      A.   Certain items within those computer assets

19   were, yes.

20      Q.   Which items?

21      A.   The ones that we have enumerated.

22      Q.   In Figure #1?

23      A.   Correct.

24      Q.   And it's limited to those devices?

25      A.   To the extent we didn't have visibility into

1    other devices, yes.

2         Q.   No network from Allied Portables; correct?

3         A.   Correct.

4         Q.   No server?

5         A.   Other than the server hosting.

6         Q.   Which was?

7         A.   Exchange.

8         Q.   And you didn't review the network or the

9    server; correct?

10        A.   We did not.

11        Q.   So how do you know that the Allied Exchange is

12   located in its server or is comprised of its server?

13        A.   Well, Exchange has to run on a server.  And

14   it's located somewhere.  We really didn't concern

15   ourselves with where because we were looking at the

16   artifacts that were on the devices that were in the

17   care, custody and control of Miss Youmans and the

18   others.

19        Q.   And you don't know where the Microsoft Exchange

20   server is located; correct?

21        A.   Do not.

22        Q.   Do you know for certain that it's not located

23   on Allied Portables' premises?

24        A.   Do not.

25        Q.   And how do you know this?

1        A.   I told you I didn't know this.

2        Q.   Okay.  What does exfiltrate Allied's materials

3   mean?

4        A.   It means to access and to -- removing digital

5   data is a bit of a misnomer because I can take something

6   but you still have it.  So you use the word exfiltrate

7   to signify when information has been accessed and

8   subsequently viewed, copied, or in some other fashion

9   accessed.

10        Q.   Sent?

11        A.   Sent would be exfiltration, yes.

12        Q.   Received?

13        A.   It would be exfiltration.

14        Q.   Depending on whether or not you look at the

15   transmittal device or the receipt device; correct?

16        A.   Yeah.  But again in email you have both sides

17   of the story because you see the sender and you see the

18   recipient and you see the full chain of connectivity

19   from one to the other.

20        Q.   You see the sender and recipient's domain name

21   -- or email domain name; correct?

22        A.   You also see the IP address and all of the

23   servers that mail routes through from the sender to the

24   recipient.

25        Q.   And do you know for certain that the computer

1    assets of Allied were intentionally and deliberately

2    accessed by Youmans and Mr. Oswald?

3         A.   Based on the information we were able to view

4    and the analysis of the material we had available to us

5    it is our belief that the parties named purposely and

6    deliberately accessed that information and emailed it to

7    themselves.

8         Q.   And that information consists of what?

9         A.   What's in our report.

10        Q.   Computer assets?

11        A.   They -- are you asking me if they accessed

12   computer assets?

13        Q.   I'm asking you if the information is comprised

14   of computer assets.

15        A.   It's comprised of digital data belonging to

16   Allied on Allied's computer assets.

17        Q.   And you say belonging to Allied what do you

18   mean?

19        A.   My position would be that the information on a

20   company's network is the property of the company, that

21   intellectual property.

22        Q.   Well, would you say that a minority owner is an

23   owner of the company?

24        A.   I wouldn't make that judgment.  I'm not an

25   attorney.

1      Q.  I'm not asking you to make a legal conclusion.

2  I'm asking you whether or not a minority owner is

3  considered an owner of a company?

4      A.  Depends under what circumstances.  There would

5  be too many caveats for me to even make a possible

6  guess.

7      Q.  Do you know whether or not Robin Youmans is a

8  minority owner of Allied Portables?

9      A.  I do not.

10     Q.  How about Bill Oswald?

11     A.  Do not.

12     Q.  Any of the other named defendants?

13     A.  No.

14     Q.  Nobody told you any of that information?

15     A.  No.  We were told that Miss Youmans left the

16  company.

17     Q.  On her own?

18     A.  No.  She had been terminated.

19     Q.  As an employee or in what capacity?

20       MR. COLEMAN:  Object to form.

21     A.  Yeah, as an employee.  You know, we didn't go

22  into specifics, just Miss Youmans had left the firm and

23  had started a competitive business.

24     Q.  Do you know when she left the firm?

25     A.  It was reported to us to be August 29, 2014.

1    Q.  The materials that were forwarded through the

2    Allied Portables' Microsoft Exchange email system on

3    August 30th of 2014 to the gmail account do you know

4    whether or not those materials consisted of Allied

5    Portables' finances and customers?

6    A.  I don't recall the specifics.  We did produce a

7    list of over 440 attached emails.  We did do a selective

8    viewing of some of those emails based on title, which

9    are noted in paragraph 2 on page 3.

10   Q.  The Allied passwords, TAC Notes, Clear

11   Computing Customer Receipt/Purchase Confirmation,

12   Chester loan bal, and monthly driver schedule; correct?

13   A.  Yes, sir.

14   Q.  It's limited to those documents; correct?

15   A.  Not limited to those documents.  We simply

16   pointed out that these were representative of the types

17   of documents we saw.

18   Q.  Which of those documents references Allied

19   Portables' finances?

20   A.  There were other items that are not enumerated

21   which did, and again they were supplied in a listing of

22   file names.

23   Q.  So they weren't included in page 3 in your

24   analysis as the information or contents of these

25   attached emails; correct?

1        MR. COLEMAN:  Not in the second paragraph, but

2    they are in the first.

3        Q.  With respect to the second paragraph on page 3.

4        A.  Yes, that's correct.

5        Q.  But yet in your conclusion on page 6 you

6    conclude that the Allied materials that were exfiltrated

7    included information on Allied finances and customers.

8        A.  That's correct.

9        Q.  But you don't reference it in the report or

10   attach it to the report; correct?

11       MR. COLEMAN:  Counsel, he has got it in

12   paragraph 1, which you are seeking to avoid

13   apparently.

14       A.  I think a balance sheet would qualify.  I think

15   a profit and loss statement would qualify as financials.

16       Q.  Paragraph 1 of 3?

17       MR. COLEMAN:  Yes.

18       Q.  Is Robin Youmans referenced in paragraph 1 on

19   page 3 of your report?

20       A.  She is not.

21       Q.  Who is?

22       A.  Mr. Oswald.

23       Q.  Robin Youmans is exclusively referenced in

24   paragraph 2 on page 3; correct?

25       A.  Yes.

1    Q.   And with respect to the contents of those

2    attached 16 emails and 440 attachments, looking at

3    paragraph 2 of page 3 of your report which of those

4    documents that's noted there constitute Allied

5    customers?

6    A.   There were numerous other documents, other than

7    those that were cited, that referred to Allied

8    customers.

9    Q.   And that you relied on in preparing this

10   report?

11   A.   That factored into our conclusion.

12   Q.   But it's not referenced in your report?

13   A.   Correct.

14   Q.   Are those attached to your report?

15   A.   No.

16   Q.   But you relied on them in producing your

17   report?

18   A.   They helped form the basis of our opinion, yes.

19   Q.   The basis of your conclusion; is that correct?

20   A.   Yes, there were thousands of documents.  I am

21   happy to produce them, if you'd like.

22   Q.   With respect to the 14 or 16 emails in your

23   report that you identify, is there any information

24   contained in those emails that reference Allied

25   Portables' finances and customers with respect to Robin

1    Youmans?

2          MR. COLEMAN:  Asked and answered.  Object to

3     form.

4     A.  So you're asking me in any of the 440 plus

5     attachments was there any information sent from Robin's

6     account to Robin's account which contained information

7     regarding Allied customers.  The answer is yes.

8     Q.  Which?

9     A.  I don't recall specifically.

10    Q.  In the finances, Allied Portables' finances?

11    A.  Yes.

12    Q.  In which documents?

13    A.  I don't recall specifically.

14    Q.  You are the managing director of Sylint Group;

15    correct?

16    A.  That is correct.

17          MR. GIFT:  No further questions.

18                    CROSS EXAMINATION

19    BY MR. EDWARDS:

20    Q.  Good afternoon, sir.  My name is Berk Edwards.

21    I represent Mr. Oswald, Miss Langlois and Miss Palmer.

22    I'm going to ask you a series of follow-up questions;

23    all right?

24          You had mentioned or were asked a series of

25    questions regarding prior testimony or prior reports

1    that you had provided in the past, and in looking at

2    your CV attached as Exhibit A to the deposition Exhibit

3    1 on page 3 of 4 of your CV there's a heading entitled

4    Provided Declarations, Affidavits, or Reports.  Do you

5    see that?

6         A.  Yes, sir.

7         Q.  Would that list of what appears to be five

8    cases would that be the extent of the cases in which you

9    have in the past provided either a sworn declaration, an

10   affidavit or a report?

11        A.  No, there are probably others that we haven't

12   updated.

13        Q.  And when was your CV last updated?

14        A.  I wouldn't know.

15        Q.  Two of the cases on the last two bullet points

16   under that section entitled Provided Declarations,

17   Affidavits, or Reports appear to refer to 2016 case

18   numbers.  Is it fair to say that this would have been

19   updated sometime in 2016?

20        A.  It may have been.  However, it may not include

21   everything prior.

22        Q.  And for which of these cases, if any, have you

23   provided a deposition?

24        A.  I haven't been deposed in any of these matters.

25        Q.  And would that also be the same for the cases

1    that are referenced in the next section of your CV

2    entitled Primary Investigator or Substantial

3    Contributor?

4        A.  Yes.

5        Q.  No depositions?

6        A.  Correct.

7        Q.  I believe you testified previously that you had

8    been deposed in your capacity as an expert on two or

9    three other occasions?

10       A.  Many years ago, yes.

11       Q.  It appears that these cases listed in these two

12   sections based upon the case numbers would have been in

13   the last ten years; is that accurate?

14       A.  Yes, these are actually cases that probably ran

15   through '14 or '15.

16       Q.  Is it fair to say any depositions that you have

17   given in your capacity as an expert would have been

18   prior to that time frame?

19       A.  Yes.

20       Q.  Are you familiar, sir, with the Computer Fraud

21   and Abuse Act?

22       A.  I am.

23       Q.  Are you familiar with the Stored Communications

24   Act?

25       A.  I am.

1    Q.   You are aware those are both federal statutes?

2    A.   Yes.

3    Q.   Have any of the declarations, affidavits or

4  reports you have provided for the cases that are listed

5  in your CV have you ever provided a declaration, an

6  affidavit or report in connection with a case under the

7  Computer Fraud and Abuse Act?

8    A.   I believe Yellowfin has a component under the

9  CFAA.

10    Q.   That's the Yellowfin Yachts versus Barker

11  Boatworks case?

12    A.   Correct.  I don't know if Vita-Pure did or not.

13  They settled.  Those two, no.  Mr. Levanti was a

14  criminal case.

15    Q.   State of Florida versus Levanti?

16    A.   Yes, pled that.

17    Q.   Were you retained as an expert for the

18  defendant?

19    A.   Prosecution.  We worked for the sheriff's

20  department on that.

21    Q.   Did that involve a criminal CFA -- CFHA charge?

22    A.   Yes, it did.  I believe it did.

23    Q.   It was brought in State Court?

24    A.   Yes.  I couldn't really speak to the others.  I

25  am just trying to run through them in my mind.

1      Q.  Did any of the cases that potentially had a

2  component involving the Computer Fraud and Abuse Act did

3  they also have a claim involving violations of the

4  Stored Communications Act?

5      A.  I wouldn't know.

6      Q.  In the Yellowfin Yachts versus Barker Boatworks

7  case were you retained on behalf of the plaintiff or any

8  of the defendants in that case?

9      A.  The plaintiff.

10      Q.  Did you render an opinion via a report,

11  declaration, affidavit or other means that opined that

12  various individuals committed acts that may have

13  violated either the CFAA or the Stored Communications

14  Act?

15      A.  I produced reports that identified that those

16  violations had occurred.  However, the report did not

17  name them relative to the CFAA.  It was not mentioned in

18  the report but, yes, that would have been the upshot of

19  it.

20      Q.  And were you looking at emails in that case?

21      A.  We were.

22      Q.  And do you know what the disposition of that

23  case is?

24      A.  That matter is ongoing.

25      Q.  Okay.  Are you scheduled to give a deposition

1    in that case?

2         A.  As of yet, no.

3         Q.  Have you been asked to answer or provide

4    assistance in what are referred to as expert witness

5    interrogatories in that Yellowfin case?

6         A.  No, we haven't.  We have been asked to look at

7    the opposing expert's materials.

8         Q.  Who is the opposing expert?

9         A.  I don't recall.  I do not recall.

10        Q.  And is that case pending -- I note that it's

11   pending in the Middle District of Florida; what division

12   of the Middle District?

13        A.  I don't know.

14        Q.  Is there any aspect of the Yellowfin case that

15   involves employees of the plaintiff entity trying to

16   access emails or other stored communications post

17   termination of their employment?

18        A.  As a private investigator, I am bound by some

19   confidentiality, so I apologize, I don't mean to be

20   obtuse in my answers.  The principal matter at hand is

21   whether or not a former employee exfiltrated company

22   assets and then later used them in some capacity in a

23   competitive organization.  That's probably the best I

24   could provide.

25        Q.  Did this individual was he a former associate

1    or employee of Yellowfin Yachts who then became

2    associated or affiliated with Barker Boatworks?

3         A.   Yes.

4         Q.   In any of these cases listed under the section

5    of your CV regarding prior declarations or where you

6    were a primary investigator, did any other members of

7    your current firm Sylint participate at all in the

8    preparation of those opinions or reports?

9         A.   Yes.

10        Q.   Who else?

11        A.   It would have been John Jorgensen, who is our

12   senior partner, and Serge Jorgensen.

13        Q.   What is the relation of John and Serge?

14        A.   Father and son.

15        Q.   Who is the father?

16        A.   John.  We would have had other associates in

17   the firm intake the evidence as Mr. Baptiste has,

18   process files, that type of thing.

19        Q.   Who was the primary member of your firm with

20   respect to these -- it looks like nine total cases?

21        A.   The top one, two, three, four -- the top five

22   I'm the primary on those.  And on the other Serge

23   Jorgensen handled Eli Lilly V Tyco; it's a large

24   litigation case.  John was primary on State of Florida V

25   Levanti.  John on Tumi.  And I was primary on Ferguson.

1    Q.   On the cases involving where you were the

2    primary investigator -- or your firm was primary

3    investigator or substantial contributor was there, in

4    addition to private investigative work, was there also

5    computer extraction or data extraction work associated

6    with those cases?

7    A.   Yes in all of these matters.

8    Q.   All of them?

9    A.   Yes.

10   Q.   All nine?

11   A.   Yes.

12   Q.   So just so I understand, there would have been

13   a component of private investigative work in all nine of

14   these cases; correct?

15   A.   We would interpret it as such, yes.

16   Q.   Well, to be distinguished from computer

17   extraction or data extraction.

18   A.   Okay.  We look at private investigative work as

19   --

20   Q.   A component of that?

21   A.   Literal, yeah, in that you are supposed to be

22   licensed to review the habits or activities of others

23   for compensation according to the State of California --

24   or the State of Florida rather, and that's how we see

25   this.  But, yeah, digital data extraction, yes,

1    certainly on all of these matters.

2        Q.  Other than the Yellowfin Yachts case, are any

3    of the cases here listed on page 3 of your CV that are

4    currently active and ongoing?

5        A.  Lopez V Flores.  And I think Tumi is still

6    ongoing.

7        Q.  Tumi Entertainment?

8        A.  Yes, sir.

9        Q.  And what was the disposition of the first case,

10   FD Destiny versus AVP Destiny?

11       A.  It's my understanding they settled.

12       Q.  How about Vita-Pure?

13       A.  Also settled.

14       Q.  And then you reference there's a sealed case

15   that's in an appellate court, in the District Court in

16   D.C.?

17       A.  I'm not sure what I can say about that.

18       Q.  It's an ongoing case?

19       A.  Yes.

20       Q.  And then with the exception of the Tumi case,

21   the other cases have resolved themselves under the

22   section entitled Primary Investigator?

23       A.  Yeah.  We won the Eli Lilly matter on behalf of

24   the defendant Tyco.  State of Florida Mr. Levanti took a

25   ten-year plea bargain.  And Ferguson V Ferrante settled.

1          Q.  Did Mr. Jorgensen provide deposition testimony

2     in the Eli Lilly matter?

3          A.  Serge Jorgensen did, yes.

4          Q.  Did he also testify at trial?

5          A.  Yes, I believe he did.

6          Q.  Did Serge Jorgensen have any input or

7     involvement in the work that culminated in the report

8     preparation in this matter?

9          A.  No.

10         Q.  But John Jorgensen did?

11         A.  Yes.

12         Q.  In looking at the report I don't see a date of

13    its preparation.  Do you know when it was prepared?

14         A.  It should be on the cover, 9-22.

15         Q.  Okay.  There we go.  And I believe you had

16    mentioned there is, in fact, a written engagement letter

17    between your firm and Mr. Coleman's firm?

18         A.  Correct.

19         Q.  Is that something that you have in your

20    possession today?

21         A.  I do not.

22         Q.  I did note that you brought some documents with

23    you today; what did you bring with you today?

24         A.  A copy of the notice of taking deposition, a

25    copy of the report, an excerpt of artifact information

1    surrounding the Livedrive we discussed.

2        Q.  Okay.

3        A.  And then some of my notes.

4        Q.  All right.  Is that information that you

5    referenced that you brought is that incorporated into

6    your report?

7        A.  It is an amplification and the detail contained

8    in the report.

9        Q.  Do you mind if I take a look at the page

10   concerning the Livedrive?

11       A.  I have no objection.

12           MR. COLEMAN:  No.  If you have used it during

13       the course of this deposition, he is entitled to

14       see it.

15       A.  That's fine.  It was printed on three pages.

16       Q.  All right.  You have handed me three different

17   pages.

18       A.  They kind of go together.

19       Q.  Kind of like an Excel spreadsheet?

20       A.  Exactly.

21       Q.  And these three pages amplify, if you will, the

22   portion of your report where you identified the

23   Livedrive for Allied?

24       A.  Yes, artifacts on the bottom of page 5.  These

25   would be the artifacts.

1    Q.  How is this document produced, in what format?

2    A.  That is a screen shot of the report that's

3    generated through an application called Internet

4    Evidence Finder.  What that does is that allows us to go

5    ahead and gather and assemble artifacts that may be

6    sitting on a computer hard drive primarily related to

7    internet activity, web browsing, that type of thing.

8    Q.  Okay.  Let's go ahead -- if you don't mind, and

9    we can either make a copy of this, but we will mark this

10   as Exhibit 2.

11       MR. COLEMAN:  I think it's 3.

12       MR. GIFT:  Just do a composite.

13       (Exhibit 3 marked for identification.)

14   Q.  What we marked temporarily with the sticky tab

15   Composite Exhibit 3, just to cross reference with the

16   report, on the bottom of page 5 of your report it states

17   -- the last sentence states, "Additionally, artifacts

18   were identified on this computer that are consistent

19   with this device being connected to the Livedrive cloud

20   storage account on September 1, 2014."  Does Exhibit 3

21   refer to or reference the artifacts that I just

22   referenced in your report?

23   A.  Yes.

24   Q.  All right.  The other documents that you

25   produced we will go ahead and put a sticky tab on it as

4.

(Exhibit 4 marked for identification.)

What is this document?

A.   Just my notes.  The top is an explanation of
what an obliterated file is and where they are found,
which we touched on briefly in relationship to wiping of
the iPhone 4S.

And then the lower section again is just a
screen shot of the emails that were identified going
from Miss Youmans' Allied account to her gmail account.

Q.   When you refer to -- I believe your report
talks about 16 emails, that would be 16 here?

A.   Should be 16 here.  I didn't count them.  I am
not sure that screen shot is complete.  Is that 16?

Q.   Yes.  I want to ask you a few more questions
about the evidence logs in particular about
Mr. Baptiste.  What is his position with the Sylint
Group?

A.   He is a forensic technician.

Q.   And what are his duties as a forensic
technician for Sylint Group?

A.   Intake and processing of evidentiary materials
primarily.

Q.   And did he, in fact, intake and process all of
the evidence devices or repositories that are referred

1    to in your report in this case?

2         A.  Yes.

3         Q.  You mentioned that when evidence is taken in by

4    the Sylint Group that you have people that will

5    memorialize it, photograph it, et cetera.  Would

6    Mr. Baptiste be the one that does all of that?

7         A.  Primarily, yeah.

8         Q.  Would he be the one that would have done that

9    such as the photos in this particular case?

10        A.  Yes.

11        Q.  Would anybody else assist Mr. Baptiste?

12        A.  It's possible.  I'm not aware of anybody in

13   this matter.

14        Q.  Okay.  All of the repositories, devices,

15   laptops, cell phones, tablets that are listed in -- I

16   believe you referred to it as Figure 1 in your report,

17   to the best of your knowledge and understanding, did all

18   of those come to you, the Sylint Group, from John Noble?

19        A.  No.  We have identified the first three I

20   believe came from Buchanan Ingersoll.

21        Q.  Those first three, and if my understanding is

22   correct, the first three logs evidence DVDs or other

23   pieces of evidence that you did not rely upon in

24   preparation of your report?

25        A.  Correct, as well as number 18, which was also a

DVD that was supplied to us later.

Q.   Just so I'm clear, all pieces of evidence that you did, in fact, rely on in preparation of your report, to your knowledge and belief, would have come from John Noble?

A.   Let me just verify that.  I believe that to be correct, yes.

Q.   And I believe it was your testimony that you don't recall ever having a personal conversation with John Noble?

A.   Not about this matter.

Q.   Did anybody in your firm have a conversation with him?

A.   I believe Mr. Baptiste did.

Q.   Were you aware or have you ever dealt with or your firm dealt with John Noble before this case?

A.   Not to my knowledge.

Q.   Have you ever heard of John Noble before this case?

A.   May have.  Again, nothing concrete sticks out. I understand him to be a law enforcement officer on the east coast somewhere.

Q.   You were asked a question or some questions by Mr. Gift regarding whether you had ever been qualified as an expert, and I believe you said the answer is no?

1          A.   Correct.

2          Q.   Have you ever been disqualified as an expert?

3          A.   No.

4          Q.   Has any opinion that you have ever rendered in

5     a case ever not been accepted by a court?

6          A.   No.

7          Q.   Have you or any opinion that you have ever

8     rendered ever been subject to what's called a motion in

9     limine or a motion to exclude or limit opinion

10    testimony?

11         A.   Not to my knowledge, no.

12         Q.   Are you aware of any opinions rendered by

13    anyone affiliated with the Sylint Group that have ever

14    been rejected, disregarded or precluded by a court?

15         A.   I am not aware of any.  John Jorgensen, our

16    senior partner, often serves as a Special Master for the

17    court, so he is pretty highly regarded.  He also

18    lectures on discovery to the ABA and the judiciary.

19         Q.   Did you yourself perform all of the data

20    reviews of the devices listed in your report?

21         A.   Can you be more specific when you say data

22    reviews?

23         Q.   I believe you mentioned the various equipment

24    was utilized to come up with various opinions that you

25    rendered with respect to whether certain access was made

1  to computers.

2       A.  Right.

3       Q.  Other than yourself, who might have

4  participated in assisting you in coming up with those

5  opinions?

6       A.  I would have had Matt Baptiste process the data

7  using the various tools we have identified on Figure 1.

8  I would have asked him to identify certain files for me,

9  and then I would have reviewed those files.

10      Q.  All right.

11      A.  Files and artifacts I should say.

12      Q.  And did the entirety of the data review and

13 analysis, whether it was done by Mr. Baptiste or

14 yourself, did it take place at your office in Sarasota?

15      A.  Yes.

16      Q.  Have you ever been to the offices of Allied

17 Portables?

18      A.  I have not.

19      Q.  Have you ever met anyone that is a member of

20 the Adamson family?

21      A.  I have not met them, no.

22      Q.  Do you know them to have any relationship with

23 Allied Portables?

24      A.  I believe so.  We did have a conversation with

25 counsel via telephone.

1      Q.  You were asked some questions regarding the

2   scope of what Sylint was engaged to do by Buchanan

3   Ingersoll.  And if you take a look at Exhibit 1, page 1

4   of your report, the first sentence under Background it

5   says, "-- to perform forensic analysis and provide

6   expert opinion regarding a number of computer devices

7   and forensic evidence files of computer devices."  Is

8   that a fair statement of the scope of what your company

9   was engaged to perform?

10      A.  At a high level, yes.

11      Q.  After reviewing and performing your analysis of

12   the devices and the repositories you have listed in

13   Figure 1 to your report, were you able to come up with

14   any evidence of any access by either -- let's start with

15   Bill Oswald, by Mr. Oswald and subsequent to August 30,

16   2014 from any of these devices?

17      A.  We were able to identify in the same fashion as

18   we discussed earlier with Miss Youmans that Mr. Oswald

19   had accessed the Allied email account and forwarded a

20   total of 110 emails with attachments to his Billopro.com

21   account using both his iPhone and his iPad.

22      Q.  And other than those 110 emails that the report

23   says commenced being sent on August 30, 2014 at

24   approximately 8:35 a.m. and ending at approximately

25   12:47 p.m. that same day, were you able to identify any

1  other access or attempted access to Allied's computer

2  system by Mr. Oswald?

3      A.  No, we were not.

4      Q.  Have you ever heard of Debra Palmer?

5      A.  I have not.

6      Q.  Is it fair to say that you have not rendered

7  any opinion concerning whether or not Miss Palmer may

8  have improperly accessed any business information about

9  Allied Portables?

10     A.  I have no knowledge.

11     Q.  And have you heard of Lori Langlois?

12     A.  Yes.

13     Q.  Have you rendered any opinions in connection

14 with Lori Langlois with respect to this case?

15     A.  Other than the fact that we identified that an

16 email is noted on the top of -- bottom of page 3 to the

17 top of page 4, that would be the only opinion we

18 rendered regarding Miss Langlois.

19     Q.  And this would have been an email that is

20 identified in what's referred to as Figure #2 in your

21 report?

22     A.  Correct.

23     Q.  And that appears to be dated November 6, 2014?

24     A.  Correct.

25     Q.  And is that email -- it's not from an Allied

1    Portables domain, is it?

2         A.  No, it's not.

3         Q.  It appears to be from a gsportables.com domain?

4         A.  Correct.

5         Q.  Let me ask you, if you can, do you have Exhibit

6    2, the affidavit of Mr. Noble in front of you?

7         A.  Yep.

8         Q.  If you can turn to page 7 of 11, paragraph

9    number 19.

10        A.  Uh-huh.

11        Q.  And I believe, correct me if I'm wrong, you

12   don't believe that you have ever seen this supplemental

13   affidavit of Mr. Noble before?

14        A.  That's correct.

15        Q.  In preparing your report did you review the

16   testimony by virtue of an affidavit or deposition or

17   declaration from any witness or expert witness in this

18   case?

19        A.  I don't believe so, no.

20        Q.  Did you review any of the pleadings in this

21   case?

22        A.  No.

23        Q.  Is your report limited solely to data that was

24   analyzed and/or extracted from the devices that are

25   listed in Figure 1 on the report?

1    A.  Yes.

2    Q.  Okay.  Mr. Noble's affidavit refers to --

3  appears to reference 69 emails that Mr. Oswald purported

4  to send from his Allied email address to his Billopro

5  email address.  You were able to actually identify 110

6  emails though?

7    A.  That's correct.

8    Q.  And do you still maintain copies of all 110

9  emails with attachments?

10    A.  We do.

11    Q.  Do you know if anyone in your firm had any

12  communications with Mr. Noble regarding what appears to

13  be a discrepancy in the number of emails that Mr. Oswald

14  sent himself on August 30th of 2014?

15    A.  I don't believe so, no.

16    Q.  In your firm's analysis of the laptop computer

17  used by Mr. Oswald, did -- was there any indication that

18  there was an attempt to send emails that were not

19  actually received on his Billopro.com address?

20    A.  I don't recall.

21    Q.  Would the 110 emails that are referenced in the

22  report would those refer to emails that were actually

23  sent and received?

24    A.  Yes.

25    Q.  So if there were emails that were attempted to

1  be sent but not received, that would not be reflected in

2  the 110?

3       A.  I believe so, yes.

4       Q.  On the top of page 3 of 6 of your report there

5  is a statement, "It was reported that his date of

6  termination from Allied was August 29, 2016."  Again, is

7  that a typo?

8       A.  It is.  It should be 2014.

9       Q.  Okay.  And who reported to you any of the

10 circumstances including the date of Mr. Oswald's

11 termination?

12      A.  It would have been Mr. Coleman.

13      Q.  All right.  Do you recall any specifics that

14 Mr. Coleman gave you regarding the circumstances of

15 Mr. Oswald's termination?

16      A.  Other than the fact that he was terminated by

17 the company and had gone into a competitive endeavor.

18      Q.  What was the competitive endeavor that he

19 referenced?

20      A.  I believe Garden Street Portables.

21      Q.  Were there any other participants in that

22 conversation, when Mr. Coleman advised you of

23 Mr. Oswald's termination, if you can remember?

24      A.  Quite possibly, yes, other partners in the law

25 firm -- or other attorneys in Mr. Coleman's law firm.

1    Q.   So that was a telephone call?

2    A.   Yes.

3    Q.   Would that have been after your firm had been

4    engaged or would that have been part of the initial

5    consultation, if you will?

6    A.   Probably part of the initial discussion.

7    Q.   Have you ever spoken to an attorney at the

8    Buchanan firm by the name of Garey Butler?

9    A.   I don't know that I have.  I remember obviously

10   you, and Potter, and -- I don't know if Mr. Butler was

11   involved.  I don't recall the name.

12   Q.   Have you heard of the name Garey Butler in

13   connection with this case?

14   A.   No.

15   Q.   You mentioned you have spoken to David Potter,

16   Mr. Coleman's partner?

17   A.   Yes.

18   Q.   Anybody else, any other attorneys that you have

19   spoken to at Buchanan?

20   A.   I don't recall who may have been on the

21   conversation in addition.

22   Q.   During the discussion that you had with

23   Mr. Coleman regarding Mr. Oswald's termination from

24   Allied Portables, was there any discussion what Bill

25   Oswald's role was with Allied Portables?

1      A.  No.

2      Q.  Was there any discussion whether or not

3  Mr. Oswald subsequent to his termination or

4  contemporaneous with his termination on August 29th of

5  2014 was likewise having his access to the Allied

6  computer system being revoked?

7      A.  I don't recall any.

8      Q.  Do you know if, in fact, Mr. Oswald continued

9  to have access to his Allied email account on August 30,

10  2014?

11      A.  Yes.

12      Q.  Okay.  And you know that because you were able

13  to review certain emails on his laptop that he sent to

14  the Billopro address?

15      A.  We found them on -- let me see which machine it

16  was.  Bear with me a second.  Yes, on his laptop, the

17  Allied laptop we identified as AP0003, which was -6 on

18  our list on Figure 1.  Again, through ActiveSync we were

19  able to identify that his activities on both his iPad

20  and his iPhone were memorialized on his laptop.

21      Q.  Is it fair to say then that his credentialing,

22  his log-in, his password to access his Allied email

23  account had not been terminated as of August 30, 2014?

24      A.  That would be our conclusion.

25      Q.  Do you have any idea when his credentialing

1    including his log-in and password were terminated by

2    Allied Portables with respect to his access to the

3    Allied email account to the extent his credentialing was

4    terminated?

5         A.  I do not.

6         Q.  Has anyone ever advised you of that, that it

7    was terminated?

8         A.  Yes.

9         Q.  And who advised you of that?

10        A.  That was probably in discussion when we spoke

11   with Mr. -- is it Adamson?  We had a phone call.  He was

12   on the phone at one time.

13        Q.  Only if you know, sir.

14        A.  Sir?

15        Q.  Only if you can recall.

16        A.  I don't recall.

17        Q.  Did somebody from the Adamson family advise

18   that you Mr. Oswald's credentialing to access the Allied

19   computer system had been revoked?

20        A.  I believe so, yes.

21        Q.  Does Todd Adamson ring a bell?

22        A.  Yes.

23        Q.  Is that who you spoke to?

24        A.  I believe so.

25        Q.  What in particular did Todd Adamson tell you

1    about the relocation of Mr. Oswald's credentialing to

2    access Allied Portables' computer system?

3        A.  We had just asked if the passwords had been

4    reset and they said yes.

5        Q.  And do you have any notes, emails, diary

6    entries or anything that would memorialize when that

7    telephone conversation took place?

8        A.  I don't know.  I don't know if it was a planned

9    conversation or if it was a call that we had with

10   Mr. Coleman's office.  I just don't recall.

11       Q.  Did Mr. Adamson advise you when Mr. Oswald's

12   credentials regarding access to the computer system had

13   been revoked or terminated?

14       A.  I don't believe so, no.

15       Q.  In that same conversation was the access to the

16   Allied Portables' computer system, the credentialing,

17   discussed with respect to Robin Youmans?

18       A.  To the extent that all passwords had been

19   reset, yeah.

20       Q.  And would the same be true for Lori Langlois?

21       A.  Yes.

22       Q.  Mr. Oswald -- excuse me, Miss Palmer?

23       A.  I don't know that name.

24       Q.  Okay.  In preparation of your report, in

25   particular the paragraph that we're talking about

1    concerning Mr. Oswald at the top of page 3, you provide

2    an excerpt or a portion that talked about the contents

3    of the attachments and then you talk about various

4    attachments consisting of payroll register, balance

5    sheets, customer lists, et cetera.  Did you have any

6    direction as to what examples to give as far as what you

7    found in the attachments?

8         A.   No.

9         Q.   Did you do that on your own accord?

10        A.   Yes.

11        Q.   Have you ever been shown any documentation

12   regarding the termination by Allied Portables of any of

13   the named defendants in this cause?

14        A.   No.

15        Q.   In preparation of your report and your opinions

16   in this case, did you ever have occasion to review any

17   emails sent by Lori Langlois while she was employed at

18   Allied Portables?

19        A.   Yes.

20        Q.   Okay.  Are those referenced in your report at

21   all?

22        A.   No.

23        Q.   And why not?

24        A.   Didn't find anything notable.

25        Q.   Would that mean you didn't find anything that

1    she sent without the requisite authorization?

2         A.  We wouldn't know.  We didn't see any

3    communication between her and the co-defendants, if you

4    will, the other parties.  There was some nominal emails,

5    but nothing of any consequence.

6         Q.  Okay.  In fact, in the conclusion of your

7    report on page 6 of 6 you don't give any opinion as to

8    Lori Langlois at all; do you?

9         A.  No.

10         Q.  Figure #2 on page -- on the bottom of page 3 of

11    6 over to page 4 of 6 you state that this appears to

12    have been an email sent by her to Allied customers to

13    solicit their business and this is a sample of one such

14    email.  Do you know who this email is even being sent

15    to?

16         A.  Someone named Andrea.

17         Q.  Right.  But we referred to in some prior

18    testimony about the header portions of emails about the

19    sender and the recipient; do you see any recipient

20    information that you cut and pasted here?

21         A.  No, I am not sure where we got this.  In terms

22    of -- I know what machine we got it from, but I don't

23    know --

24         Q.  The machine would have been her hard drive at

25    Garden Street Portables?

1    A.   Correct.  But it was clear through the body

2    copy of the intent.

3    Q.   But you have no idea who Andrea is?

4    A.   Correct.

5    Q.   You have no idea whether or not Andrea, to the

6    extent she is affiliated with a customer or former

7    customer of Allied Portables, is, in fact, even a

8    customer of Allied Portables?

9    A.   Well, since she says she is reaching out to her

10   old customers, one can infer.

11   Q.   In preparation of your report, did you have

12   occasion to communicate with any entities that were

13   identified in your report as apparent Allied customers?

14   A.   No.

15   Q.   Do you know what the business is of Billopro,

16   LLC?

17   A.   I do not.

18   Q.   Have you rendered any opinions with respect to

19   Billopro, LLC in this case?

20   A.   Other than the fact that the email appears to

21   be the recipient of -- I understand it's under the care,

22   custody and control of Mr. Oswald, and he was the

23   recipient of the email sent from his Allied Portables

24   account.

25   Q.   You were asked some questions by Mr. Gift as to

1     the last time that any of the devices listed in your

2     Figure 1 in your report were connected to the Allied

3     Portables' network or server; do you recall that line of

4     questioning?

5          A.   I do.

6          Q.   Do you have any records within your file that

7     would evidence a specific date when the last time that

8     any of those devices were, in fact, connected to the

9     network?

10         A.   Yes.  We would have log-ons and they would be

11    available.

12         Q.   But, as we sit here today, you don't know

13    specific dates?

14         A.   No.  For the purpose of our report we were

15    looking at a very focused time frame concerning the

16    amount of material and the time we had to look through

17    it.

18         Q.   Your letter of engagement would that

19    specifically identify when you were, in fact, engaged in

20    this case to commence your review?

21         A.   It would have had a date on it.  But beyond

22    that I don't know if it would specifically say

23    commencing on such and such a date or anything like

24    that.

25         Q.   This -- and I'm not sure what actually to call

1    it, excuse my computer ignorance, but ActiveSync is that

2    something that is Microsoft based?

3         A.  It is, Windows.

4         MR. EDWARDS:  All right, sir, thank you for

5    your time.

6         Sir, in the event that we have your deposition

7    typed up, you have the ability to read it to make

8    not only typographical changes but also substantive

9    changes, and we would obviously have the right to

10   ask you why you substantively changed your

11   testimony, or you can elect to waive the reading if

12   you like.

13        THE WITNESS:  I would rather not waive.

14        MR. COLEMAN:  He will read.

15        (Deposition concluded at 5:04 p.m.)

16

17

18

19

20

21

22

23

24

25

```
                           ERRATA SHEET
            DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

            IN RE:  ALLIED PORTABLES V YOUMANS 11-1-2016
            PAGE LINE                CHANGE                  REASON
```

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

```
            Under penalties of perjury, I declare that I have read
            my deposition and that it is true and correct subject to
            any changes in form or substance entered here.


            _____      _____
                    Date                        JEFFREY M. BIRNBACH
```

STATE OF FLORIDA  )
COUNTY OF LEE     )

       I, the undersigned authority, certify that
JEFFREY M. BIRNBACH personally appeared before me and
was duly sworn.

       WITNESS my hand and official seal this 2nd
day of November, 2016.

*Karen K. Crawford*

      Karen K. Crawford, CSR
      Notary Public - State of Florida

\*    \*    \*    \*    \*    \*    \*    \*    \*

(STATE OF FLORIDA  )
(COUNTY OF LEE     )

       I, KAREN K. CRAWFORD, Certified Shorthand
Reporter, do hereby certify that JEFFREY M. BIRNBACH was
notified via U.S. mail and/or telephone that the
transcript of the deposition was available for reading
and signing; that as of this date the deponent has not
read and signed the transcript for the following reason:

_____

      Dated this _____ day of _____ 2016.


     (This transcript has been digitally signed.)

*Karen K. Crawford*

      Karen K. Crawford, CSR, RPR, FPR

```
(STATE OF FLORIDA  )
(COUNTY OF LEE     )
```

I, Karen K. Crawford, Certified Shorthand Reporter, do hereby certify that I was authorized to stenographically report and electronically record the foregoing deposition of JEFFREY M. BIRNBACH that a review of the transcript was requested; and that the transcript is a true record of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 2nd day of November, 2016.

*(This transcript has been digitally signed.)*

*Karen K. Crawford*

```
Karen K. Crawford, CSR, RPR, FPR
Notary Public - State of Florida
Commission No. FF012105
My commission expires: 7-12-2017
```